## CRAIG *v.* HOBBS.

PRINCIPAL AND SURETY.—*Fraud of Principal in Obtaining Signature of Surety.*—Where the payee of a promissory note filled the same up and gave it to the maker to obtain the name of a surety thereon, and the maker applied to a person who could not read or write, and asked him to sign the note as surety, stating to him that it was for a certain sum smaller than that expressed in the note, and he thereupon authorized the principal to sign his name to the note, without asking that it might be read, the payee not having anything to do with procuring the signature, and not being chargeable with any fraud or deception;

*Held,* that the surety was liable for the amount of the note.

From the Hamilton Common Pleas.

*D. Moss* and *F. M. Trissal,* for appellant.

*T. J. Kane* and *A. J. Shirts,* for appellee.

DOWNEY, C. J.—This was an action by the appellant against the appellee on a promissory note, made by one Grissom, with the appellee as his surety, to the appellant. Grissom having died, the action was against Hobbs alone. The note is for seven hundred and fifty-eight dollars and ninety cents, dated January 4th, 1870, and payable in thirteen months after date.

The defendant pleaded that he never signed the note or authorized any other person to sign it for him. The issue was, by agreement, tried by the court, and there was a finding for the defendant. The plaintiff moved the court for a new trial, on the ground, among others, that the finding was not sustained by sufficient evidence. This motion was overruled, the plaintiff excepted and put the evidence in the record by a bill of exceptions.

The error assigned is the overruling of the motion for a new trial.

The evidence on the trial was substantially as follows: Craig, the plaintiff, testified that he was the owner of the note; that he filled it up as it is, except the signatures, read it to Grissom, and handed it to him to read and get surety on it. In about an hour or an hour and a half, Grissom returned the note with signatures, as it now appears.

Hobbs testified: I am a brother-in-law of Grissom; had known him for ten or eleven years before the note was given; Grissom came to me one day in January, 1870, and told me he wanted me to sign a note to Craig. He never requested me to sign more than the one note to Craig; I never signed the note, but I authorized Grissom to put my name to a note for three hundred and sixty dollars; I did not request Grissom to read the note to me; I placed confidence in Grissom; I saw him have a paper in his hand; Grissom signed my name to the note at the bureau in my

Craig *v.* Hobbs. ·

house; Fred. Dietrich and Mr. Whitehead were present when the note was signed; Grissom wanted me to sign the note; I told him I could not read or write, and he must put my name to the note; Grissom then turned around and wanted my wife to sign the note. She told him she never had signed my name to a security note and never intended to. He then turned around to the bureau and wrote something. I do not know what he wrote. He put the paper in his pocket and after talking awhile went away. I thought Grissom was writing my name to a note for three hundred and sixty dollars, as his surety. He did not tell me whether he had put my name to the note or not. I made no objection to Grissom's taking the note away. On cross-examination, he stated, in addition to the matters above set forth, that when Grissom came to his house, he asked him to step out of the house with him; that he went out with him; he said he had bought Craig's wheat for three hundred and sixty dollars, and Craig required security for three hundred and sixty dollars; he told Grissom he did not much like to go security. Grissom said it was for a piece of wheat, and he thought he could double his money on it, and he wanted him to go his security for three hundred and sixty dollars; they then went into the house, and he pulled out a piece of paper from his pocket; then he told me he wanted me to sign a note for three hundred and sixty dollars for a piece of wheat that he had bought for three hundred and sixty dollars. I told him, " George you know I can not read or write, and you will have to sign my name to the note calling for three hundred and sixty dollars." He did not make his mark to the note. Nothing was said about his signing a note for seven hundred and fifty-eight dollars and fifty-nine cents. The March following, he learned that his name was to a note for seven hundred and fifty dollars, and went to see Grissom about it. The note was not read to him. His wife could read writing, and she was present at the time; was ten feet from Grissom when he signed the note; had no idea that Grissom would mislead him; did not ask Grissom to have any one else read

the note; does not think he would have signed a note for seven hundred and fifty dollars; would not have signed such a note as surety for Grissom.

Whitehead testified that he was present when the note was signed; that Grissom told Hobbs he wanted to see him. They went out on the porch; they came back; Grissom told him he wanted him to sign that note. Hobbs said you know that I can not write or read writing. Grissom turned around to Mrs. Hobbs; said it was wheat that he had bought from Craig for three hundred and sixty dollars, and asked her to sign Hobbs' name as security for a note of three hundred and sixty dollars. Mrs. Hobbs said she had never signed Mr. Hobbs' name to a security note and never would. Nothing was said about his signing a note for seven hundred and fifty dollars. The note talked of was for three hundred and sixty dollars. Grissom took the note out of his pocket, when they came back into the house. Mr. Grissom did not say anything about the note. After Grissom signed the note, he put it in his vest pocket and went away. No one asked Grissom to read the note, nor did he try to keep any one from reading it.

Dietrich testified to the same as Whitehead; neither of them could read or write.

Craig knew of no deception or unfair practice of Grissom to induce Hobbs to sign the note.

The question is, whether or not Hobbs is bound by the note signed under the circumstances. We must regard the case precisely as if Hobbs had signed the note himself under the same circumstances. He authorized Grissom to put his name to it, and the act of Grissom in signing it was the act of Hobbs, so far as the act of affixing the signature is concerned. Craig had nothing to do with procuring the signature of Hobbs to the note. No fraud or deception can be charged upon him. When he had filled up the note, read, and handed it to Grissom, he had no more to do with it until it was returned to him with the signatures of the makers to it. Assuming for the present that the statement

made by Grissom to Hobbs, when he went to him to get him to sign the note, that it was a note for only three hundred and sixty dollars, is binding on Craig, still we do not think that, under the circumstances, this should avoid the note. In *Seeright* v. *Fletcher*, 6 Blackf. 380, the ground of defence was, that the constable who made the levy and took the delivery bond, on which the suit was brought, falsely and fraudulently represented to the defendant that the property was to be delivered to the constable on a day different from that which was stated in the bond ; that the bond was executed in confidence of said false and fraudulent representations, without the same being read to him or by him, and that he was thereby deceived and prevented from delivering the property on the day named in the bond. The court, SULLIVAN, J., delivering the opinion, said : " The first error assigned is, that the court sustained the demurrer to the defendant's special plea. The demurrer we think was correctly sustained. It does not appear that the defendant was deceived by the representations made to him, or if he was, it is manifest that it was the consequence of his own folly. If the defendant were an illiterate man, and the bond had been misread to him, he not being able to detect the imposition, the case would have been different. But it appears that he signed the bond without reading it himself, or hearing it read, and with all the means of knowing the truth in his power, reposed a blind confidence in representations not calculated to deceive a man of ordinary prudence and circumspection. In such a case the law affords no relief. 2 Starkie Ev. 374." See, also, *Rogers* v. *Place*, 29 Ind. 577.

But in *Jenners* v. *Howard*, 6 Blackf. 240, *non est factum* having been pleaded, the defence was, that the maker of the bond was induced by his co-obligor to sign the bond by undue influence, when he was in a state of intoxication brought about by the other maker of the bond, etc. The court said : " It was not pretended that the plaintiff had any influence whatever over Howard, nor that there was any collusion between the plaintiff and Carroll to circumvent him.

Nor does it appear that Carroll even, in reference to this transaction, exercised the influence he was said to possess. To avoid the bond on the ground of contrivance and management, by which Howard was led on to sign it, it should be shown that the plaintiff had an agency in the fraud." So we think in the case under consideration. See *Lepper* v. *Nuttman*, 35 Ind. 384, and cases cited.

The judgment is reversed, with costs, and the cause remanded, with instructions to grant a new trial.