B. LOMBARD, JR., PLAINTIFF IN ERROR, V. CHAS. N. MAYBERRY ET AL., DEFENDANTS IN ERROR.

1. **Principal and Surety:** FORGED SIGNATURES.  In an action on a bond containing the names of five persons as makers and signers thereof, the names of A. R. and M. R. were the third and fourth signatures, and that of C. N. M. was the fifth and last signature.  There was evidence tending to prove that the signatures of A. R. and M. R. were forgeries, and the jury so found.  C. N. M., being on the stand as a witness, admitted his signature to be genuine.  Upon his cross-examination by his own attorney, he testified that when he signed the bond all of the other signatures were on it; that he signed it in the office of S. P. D., attorney of the plaintiff, and obligee in the bond; that the bond was handed to him by W. S. S., the principal in the bond; that the pen with which he signed it was handed to

him by S. P. D., the attorney. Upon the trial the court charged the jury that, "if they found from the evidence that defendant M. signed the bond sued on after the names of R. and R. appeared thereon as obligors, and that defendant M. believed that such signatures were genuine, but that such signatures were really forgeries, and if they further found that Mr. D. was then acting as agent for the plaintiff and saw M. sign such bond, and handed him the pen with which he was to sign the same, then M. is not legally bound by such bond," *Held*, Error.

2. ——: ACTION ON BOND: MEASURE OF DAMAGES. In an action on a bond by W. S. S. as principal, and P. J., A. R., M. R., and C. N. M. as sureties to B. L., Jr., of which the following is the substance: "Whereas, the said W. S. S. has requested the said B. L., Jr., to purchase of him negotiable paper and securities, and to induce him so to do, has agreed to be responsible as guarantor of payment of such paper at maturity as he may offer to sell, or does sell or may have heretofore sold to said B. L., Jr. Now, therefore, it is by the said principal and sureties hereby expressly agreed, undertaken, and guaranteed to the said B. L., Jr., and his assigns, that all and every note and security negotiated by him, sent and remitted for sale, and sold to the said B. L., Jr., or through his agency and correspondence, is by the said principal and sureties jointly and severally guaranteed to be paid by the maker thereof to said B. L., Jr., or his assigns, at its maturity, at the office of the said B. L., Jr., in Lincoln, Nebraska. If not so paid by the maker at maturity, or if so paid by said makers to said S. and the amount so paid is not remitted or paid to said L. or assigns without delay, or if any such amounts have been already paid to said S and not remitted as aforesaid, within thirty days from this date pay same to said L., and if not already paid to said S., and not now due, then they shall pay same within thirty days of maturity of said note or notes, although no special contract of that character be by them, or either of them, written on any nogotiable paper sold to said B. L., Jr., or though mere assignment or general endorsement only be on such paper written. It being expressly understood and agreed by the parties to this undertaking that the said S. has, during the year commencing June 1, 1883, been engaged in buying, taking, and selling to said L. and assigns negotiable securities, and has sold to said L. negotiable securities amounting to $9,750.12, and intends to continue in the business of buying and selling negotiable securities, and that this undertaking of guaranty is intended to apply to all securities heretofore as well as hereafter negotiated to said B. L., Jr., or through his financial agency by said W. S. S.,

whether such securities now exist or are hereafter made, and is for the purpose of giving said S. credit and securing to him an opportunity to close up said last year's business, and collect himself said securities so sold for said L., and of giving said S. in his business good standing, character, and credit, to enable him the better to conduct his business and to obtain sale of securities. And the surety guarantors hereby each severally waive notice from said B. L., Jr., of the purchase or receipt by him from said W. S. S. of securities, and of the description and amount and of the non-payment thereof from time to time negotiated, except as they may specially request and enquire information thereof. This undertaking, however, is limited in amount of loss or default, to be chargeable to the sureties to the sum of $5,000, aforesaid, and in respect to time this undertaking is limited to securities now taken, or which it may be expedient to take in granting extensions on securities now so held by said L., to such extent as may be best in closing up said business negotiated and sold to said B. L., Jr., or through his agency prior to June 1, 1885," *Held*, That the measure of damages in such action is the aggregate amount or face value of the negotiable securities negotiated and delivered to the plaintiff by the said W. S. S., and received by the plaintiff in good faith within the time limited by the terms and conditions of said bond, and remaining unpaid at the time of the commencement of the suit, and not exceeding the sum of five thousand dollars with interest.

3. ———: ———: EVIDENCE. The negotiable instruments referred to in the bond, as cited in the second clause of this syllabus, were admissible in evidence for the purpose of fixing the amount of plaintiff's recovery without proof of their execution although such execution was denied in the answer.

4. ———: ———: ———. A witness, on his examination in chief at the taking of his deposition, testified that the notes in question were signed in his presence by the persons whose signatures appeared thereon. Upon his cross-examination he was asked if the notes at the time of signing were in the same condition that they then were, which question the witness refused to answer, on the ground that his answer might tend to criminate him. On the trial, this deposition having been received in evidence was stricken out, on motion of the opposite party, on the ground that the witness by answering as to the execution of the notes had waived his privilege. *Held*, Error.

ERROR to the district court for Johnson county. Tried below before BROADY, J.

*S. P. Davidson,* for plaintiff in error, cited : 1 Greenleaf Evidence, 512, note to Sec. 462. 1 Daniels Neg. Instr., Secs. 672, 673. 2 Id., Secs. 1357, 1358. *Selser v. Brock,* 3 Ohio State, 308. *Homan v. Laboo,* 2 Neb., 297. *Dinsmore v. Stimbert,* 12 Id., 438.

*E. W. Thomas* and *A. M. Appelget,* for defendants in error, cited : *People v. Bostwick,* 43 Barb., 9. *Sharp v. U. S.,* 4 Watts, 21. *Chamberlain v. Brewer,* 3 Bush, 561. *Pepper v. State,* 22 Ind., 399. *Seeley v. People,* 27 Ill., 173. *Anderson v. Warne,* 71 Ill., 20. Rapalje Witnesses, Sec. 266. Wharton Crim. Ev., 432. Comp. Stat., Code, Sec. 339.

COBB, J

The plaintiff in error brought this action in the district court of Johnson county, alleging that on May 26, 1884, the defendants in error, Wallace S. Smith, as principal, and Phineas Jones, Almon Reed, E. W. Smith, Moses Roberts, and Charles N. Mayberry, as sureties, executed their bond to the plaintiff in $5,000 guaranteeing the payment at maturity of the several notes and negotiable securities (forty-one in number) sold by Wallace S. Smith to the plaintiff, and guaranteed to be paid to the plaintiff at maturity at his office in Lincoln, Nebraska ; and if not paid at maturity by the makers, or if received by said Smith, and not paid to the plaintiff, or if in the hands of said Smith, at the date of said bond, and not paid to the plaintiff, the principal and sureties were to pay the same within thirty days from the date of the bond ; and if not paid to said Smith, nor yet due, to pay the said notes and negotiable securities within thirty days from maturity respectively. It is admitted that said Smith, during the year commencing June 1, 1883, had been engaged, as a business, in " taking, buying, and selling to the plaintiff

notes and negotiable securities," and had, at the date of the bond, sold to him an amount of $9,750.12, remaining unpaid, and to which the bond was appliable as security; that it was security for the notes negotiated by said Smith, and also to give him credit, to close up his last year's business, and to better enable him to make sale of such securities.

It is alleged that said Smith, as principal, and Phineas Jones, Almeron Reed, James H. Seay, and Charles N. Mayberry, as sureties had, on April 3, 1883, executed a prior bond to plaintiff in $5,000, guaranteeing all the notes and negotiable securities sold by said Smith to the plaintiff prior to June 1, 1884, which bond was subsequently canceled in consideration of the second bond, on which this action is brought, and which is limited to the securities then held, or those that might be taken in lieu of other securities, necessary to close up the business prior to June 1, 1885.

It is alleged that, after the execution of the second bond, on which this suit is brought, said Smith proceeded in the closing up of his business, until his sureties requested the same to be stopped; that on the execution of the bond the plaintiff relied upon it as a guaranty of the securities, and the ability of the makers; by which the sums then in the hands of said Smith and not paid over to the plaintiff were allowed to run the thirty days mentioned in the bond.

It is alleged that, at the date of the bond, and of the aggregate of the securities so purchased and held by the plaintiff, $965.94 was then in the hands of said Smith, of which $600, and no more, was subsequently paid; that of the sum of $9,750.12, the aggregate of the securities held by the plaintiff at the date of said bond, all had been due then more than thirty days, on which not more than $3,200 had been paid to the plaintiff, leaving $5,755.94, of which more than $5,000 was past due, for more than thirty days at the bringing of this suit. A description

of the notes and securities is set forth, being forty-one in number, as well as those collected by said Smith and not paid over to the plaintiff, on which the balance due is $365.94.

It is further alleged that the sureties on said bond received from said Smith money and property, as indemnity, amounting to $2,200, which they still hold as security; and that there is now due the plaintiff, on said notes and negotiable securities, $5,755.94 and interest, at the commencement of this suit $275, for which judgment is asked against defendants Reed, Roberts, and Mayberry in the sum of $5,000, with interest from July 12, 1884, and costs.

The defendants, Reed, Roberts, and Mayberry, answered and denied the allegations that they executed the bonds dated May 26, 1884, and April 3, 1883; that the promissory notes were executed by the makers, or that they were negotiated by said Smith; that said Smith ever collected or had in his hands any money that should have been paid to said plaintiff; and they aver that if the defendant, Mayberry, signed the bond sued on, his signature was obtained by the fraudulent representations of the plaintiff, or his agents, that the signatures to the bond above said Mayberry's were genuine, whereas they were forged, and that said Smith at the date of the bond of May 26, 1884, was a defaulter, and had embezzled money and property of the plaintiff, which the plaintiff knew, but concealed the fact, in order to induce the defendant, Mayberry, to sign said bond, which was without consideration to said Smith, or to the defendant, Mayberry.

The plaintiff joined the issues, denying each allegation of the defendant's answer. There was a trial to a jury and a verdict for defendants.

The court in its discretion submitted three special findings to the jury:

I.   Did defendant Almeron Reed sign the bond sued on?

II.   Did defendant Moses Roberts sign the bond sued on?

III.   When defendant Mayberry signed the bond in suit, did he believe the names of defendants Reed and Roberts to be their genuine signatures to the bond?

The jury found the first and second in the negative and the third in the affirmative.

The plaintiff filed a motion for a new trial as to Mayberry, which was overruled, and judgment rendered on the verdict, to which exceptions were taken, and errors assigned, as follows:

1.   The verdict is contrary to the evidence.

2.   The verdict is contrary to law.

3.   For errors of law occurring at the trial.

4.   For errors in sustaining defendants' objections to plaintiff's evidence.

5.   For errors in sustaining defendants' objections to each of the notes offered in evidence by plaintiff, except the Greenfield and Cavin notes.

6.   For error in refusing to exclude that portion of witness Davidson's cross-examination as to the signatures of the Minkler notes.

7.   For error in overruling plaintiff's objections to improper evidence of defendants.

8.   For refusing instructions of plaintiff, Nos. 5 and 6.

9.   For refusing and changing instruction of plaintiff, No. 4.

10.   In giving instruction of defendants, No. 1.

11.   In giving instruction of defendants, No. 2.

12.   In giving instruction of defendants, No. 3.

13.   In giving each of the court's own instructions.

14.   In sustaining the defendant's motion to strike out witness Smith's deposition as to the notes identified therein.

15.   For indiscretion preventing a fair trial.

16.   In submitting special finding No. 3.

The plaintiff's motion for a new trial being overruled

and a judgment rendered on the verdict, the plaintiff brings the cause to this court on error. His assignments of error being substantially the same as the causes assigned in his motion for a new trial, it is deemed unnecessary to set them forth.

The issues to be tried were the validity of the bond, and the liability of the sureties under it. For this purpose the plaintiff's agent and actuary, West, testified that, prior to April 3, 1883, they were buying notes of the defendant, Smith, to an amonnt, currently, of seven to ten thousand dollars; that they took the bond of that date, running to June 1, 1884, to guarantee the payment of the notes discounted; that a great many notes were taken under it, and that the signatures of Smith and Mayberry to that bond were genuine; that on an investigation of Smith's accounts with plaintiff, May 15, 1884, his indebtedness for collections, not paid over, was found to be $965, and the amount of discounts, then carried, was $9,750.12, for which the bond in controversy was executed May 26, 1884, in lieu of the former bond, which was to be canceled; and that the signatures of Smith and Mayberry to the latter bond were genuine.

In reply to the question, to describe the circumstances of taking the bond of May 26, 1884, the witness testified that, "Mayberry, one of the sureties, came up to Lincoln and informed us that Smith was involved; that he was behind with the school fund and other matters, and wanted to know how his affairs stood with us. At his request I went back with him to Tecumseh, May 14, and had an investigation of Smith's accounts. At that time it appeared he owed us about $965, notes collected and not accounted for, and had in his hand notes due and not collected, and others, coming due, sent him for collection. We found his affairs in such shape we did not think it safe to leave them with him. I took the notes away, and left them with Russell & Holmes, with instructions to

turn them over to Smith as soon as he collected and paid
the money into bank for us.   A great deal of consultation
was had between Mayberry, Smith, and myself as to per-
mitting Smith to go on and close up the business, or tak-
ing it out of his hands entirely.   I urged Mayberry to
take charge of it, but he declined.   It was finally agreed
that, as the bond under which Smith was acting would
expire June 1—this was then May 15—if he gave a new
and satisfactory bond, and if his bondsmen were satisfied
to go on and close up the business, we would consent to it.
I went home, leaving affairs in that condition.   He was
to pay the $965 in a few days.   He prepared a bond,
which he sent to us, which was not satisfactory, from de-
fects in the body.   There were blanks for signatures, and
the names of some of the signers were not written in, and
for various reasons it was rejected.   We prepared a bond,
and sent it to Mr. Davidson, which is the bond returned
to us, executed May 26, 1884.   We had a good many con-
sultations with Mayberry, subsequently, up to the time of
Smith's arrest.   At Mayberry's suggestion and agreement
the notes were left with Mr. Davidson, in Tecumseh, and
witness wrote to Russell & Holmes to turn over the notes
in their hands, to be turned over to Smith, when due, as
fast as Davidson thought to be safe.   We did not want
him to have too many at once, and yet wanted him to have
those coming due, necessary to collect."

S. P. Davidson testified that, shortly after the 15th of
May, 1884, the plaintiff's agent sent him the bond in
question, which was handed to Smith for the signatures of
his sureties.

That several days afterwards Smith returned the bond
with the signatures of the makers just as they now are.
The witness sent it, by the first mail, in its present condi-
tion, to the plaintiff.

Charles N. Mayberry testified that, prior to May, 1884,
he has been intimately acquainted with his co-defendant,

Smith, for 15 years; that his own name on the bond in question was his signature.

On cross-examination, in reply to the question, "When and under what circumstances did you sign your name there?" the witness answered that "he signed it in Mr. Davidson's office, about the time of the date of the bond."

Q. Who handed you the bond, and who handed you the pen and ink with which you signed it?

A. Smith handed me the bond, and Judge Davidson handed me the pen.

Q. Was there anything said about the bond, or any examination made of it, by the parties there at the time?

A. I examined the bond, and I don't think there was anything said. Judge Davidson, if I remember, put the blotter on the bond, and then folded it up and put it away. I think it was in the same condition as it is now.

This is the weight of evidence of the relationship and concern of the parties to each other, and to the final execution of the bond.

It does not seem important to treat separately each of the errors assigned by the plaintiff at the trial.

The court charged the jury, at the request of the defendants, that if they found from the evidence that defendant Mayberry signed the bond, sued on, after the names of defendants Roberts and Reed appeared thereon, as obligors, and that defendant Mayberry believed that such signatures were genuine, but that such signatures were really forgeries, and if they further found that Mr. Davidson was then acting as agent for the plaintiff, and saw Mayberry sign such bond, and handed him the pen with which he was to sign the same, and did sign the same, then Mayberry is not legally bound by such bond.

To this instruction the plaintiff excepts in the 11th assignment.

It does not appear that the defendant, Mayberry, was either ignorant or ill-advised of the character of his prin-

cipal, and of his business transactions, but the evidence is
that he was thoroughly acquainted with both. It was his
privilege and opportunity to have made due investigation
of the genuineness of the signatures. He examined the
bond, and signed it without the superinducement of the
plaintiff, or his agent, and without *condition* as to the sig-
natures of others. It was primarily on his suggestion and
interposition that the bond was taken, to supersede the
former one on which he was a surety. Therefore, it would
seem that an instruction, or inference, from the court to
the jury that he was liable to suffer from a mistaken be-
lief of the genuine signatures of his co-sureties may be
deemed to have been prejudicial to the plaintiff, and to
have deprived him of a fair trial. That Mayberry was
not liable as a surety, under his mistaken belief, is not an
accepted rule of law to warrant the plain charge of the
court. The contract of the surety is to be strictly con-
strued, and his liability would seem to be equal to that of
the principal in this guaranty, and not less. The surety
who signs an obligation, after the names of others, admits,
without warranty, the genuineness of those signatures, and
if the principal's or the co-sureties' names be forged without
his knowledge, and without complicity of the holder, it is
no defense to the surety that "he believed that such signa-
tures were genuine." So, that if this rule be maintained
by sufficient authority, the defendant, Mayberry, is in-
debted to the plaintiff, as the *bona fide* holder of the bond,
though the names of Roberts and Reed were forged to it.

In the case of *Selser v. Brock*, 3 Ohio St., 302, it was held
that where a fraud was practiced by a principal debtor in
procuring a surety to sign a note, without the knowledge
of the creditor, the obligation of the surety was valid and
binding; and further, that a surety who had signed his
name to a promissory note after the names of others, in
effect affirmed the genuineness of the previous signatures,
and could not avoid his liability by showing that they had

been forged by the principal, but of which the creditor had no knowledge.

This precedent is wholly analogous to the case before us. It was affirmed in a later decision of *Bigelow v. Comegys*, 5 Ohio St., 256, wherein it was held that the surety on a re-plevin bond could not set up the defense that he was induced to sign the bond upon the fraudulent representation of the principals that a co-surety, who was responsible, had already signed it, when in fact his signature was a forgery.

The doctrine of the rule was thoroughly considered in the case of *Helms v. The Wayne Agricultural Society*, 73 Ind., 325, where the instructions to the jury were consid-ered to have expressed the true rule in the proposition that, "when the name of one of two, or more, obligors in a bond, note, or other writing obligatory had been forged, the supposed co-obligor, though a surety only, and though he signed in the belief that the forged name was genuine, is nevertheless bound, if the payee, or obligee, accepted the in-strument without notice of the forgery." This then is the law to be applied to the case at bar. It corrects the instruc-tions as to the belief of the defendant, and as to the forging of the names of co-defendants, and holds the makers of the bonds to be liable to the plaintiff. It is supported directly, and in principle, by abundant authorities not important to further analyze in this opinion. *Veazie v. Willis*, 6 Gray, 90. *York Co. M. F. Ins. Co. v. Brooks*, 51 Me., 508. *Franklin Bank v. Stevens*, 39 Me., 532. *Chase v. Hath-orn*, 61 Me., 505. *Stoner v. Milliken*, 85 Ill., 218. *Hagar v. Mounts*, 3 Blackford, 57. *Harter v. Moore*, 5 Blackford, 367. *Carr v. Moore*, 2 Ind., 602. *State v. Van Pelt*, 1 Ind., 304. *Deardorff v. Foresman*, 24 Ind., 481. *State v. Pepper*, 31 Ind., 76. *Craig v. Hobbs*, 44 Ind., 363.

The second clause of the instruction to the jury, " that if Mr. Davidson was found to be acting as agent for the plaintiff (being his attorney at law), and saw the defend-

ant sign the bond, and handed him the pen with which he was to sign it, and did sign it, then that the defendant, Mayberry, was not legally bound by such bond," is not a tenable proposition, but one that ought not to have been given in charge, and is of itself erroneous and misleading.

That the act of courtesy charged, under the facts in evidence, could be deemed sufficient to predicate the complicity of the plaintiff, or his attorney, in the fraudulent execution of the bond, seems too remote and apocryphal for more serious consideration than the brief and emphatic overruling of the insinuation.

The court also charged that, "the acts and knowledge of the agents and attorneys of plaintiff that he had entrusted with the management of the business, which is the basis of the liability claimed in said bond, are the acts and knowledge of the principal, unless it shall be shown by the evidence that such agents and attorneys act without the authority of the principal;" also that if they should "find from the evidence that the plaintiff, by his agent, Mr. Davidson, showed the bond sued on in this case to defendant Mayberry, and handed him the pen for the purpose of having him sign the same, and also that the bond then had the signatures of the other defendants thereon, as obligors, and that Mayberry then believed such signatures to be genuine and signed his name thereto, on the face of such belief, then if they found from the evidence that the signatures on said bond of defendants Roberts and Reed were forgeries, and that fact was not known to Mayberry, then defendant Mayberry is not legally bound by such bond."

In addition to what is said above in regard to that part of the charge then under consideration, and which is also applicable to that part of it which is here quoted, it is also deemed to be erroneous and misleading, for the reason that there is no evidence in the case to which it is applicable. There is no evidence that "the plaintiff, by his agent, Mr.

Davidson, showed the bond sued on in this case to defendant Mayberry," nor of any "acts and knowledge of the agents and attorneys of plaintiff that he had entrusted with the management of the business which is the basis of the liability claimed in said bond." Moreover, even if it be conceded that the principle of law, sought to be laid down in the clause of the charge last referred to, is correct, the language used is inexact and obscure, and therefore misleading.

In that part of the charge given by the court, on its own motion, is found the following, being a part of No. 2: "In order to find damages for failure to pay notes, the evidence must satisfy you that there were such valid notes. This will not be elaborated here, because covered by other instructions, but this much is said, to be taken in connection with what is said in instructions given at the request of the parties, that you may not be misled as to what is meant by the use of the word note."

This instruction, like those first above referred to, is misleading, in that it is inapplicable to the evidence in the case. There is evidence that the bond sued on was given as a guaranty or security for the payment of certain commercial paper, which had been transferred by W. S. Smith to the plaintiff. These were the only notes in the case. The transfer of these notes by Smith to the plaintiff, as well as their identification as the paper intended to be secured and guaranteed by the bond sued on, was sufficiently proven by the testimony of the witness, Charles West. I do not understand the law to be that it was incumbent upon the plaintiff to prove the execution of these notes, although such execution is denied in the answer. The bond sued on contains the following clause: "It being expressly understood and agreed by the parties to this undertaking that the said Wallace S. Smith has, during the year commencing June 1, 1883, been engaged in buying, taking, and selling to said Lombard and assigns negotiable secu-

rities, and has sold to said Lombard negotiable securities amounting to $9,750.12, and intends to continue in the business of buying and selling negotiable securities, and that this undertaking of guaranty is intended to apply to all securities heretofore as well as hereafter negotiated to said B. Lombard, Jr., or through his financial agency, by said Wallace S. Smith, whether such securities now exist or are hereafter made, and is for the purpose of giving said Wallace S. Smith credit and securing to him an opportunity to close up said last year's business, and collect himself said securities so sold, for said Lombard, and giving said Smith in his business good standing, character, and credit, to enable him the better to conduct his business and obtain sale of securities, and the surety guarantors hereby each severally waive notice from said B. Lombard, Jr., of the purchase or receipt by him from said Wallace S. Smith of securities, and of the description and amount, and the non-payment from time to time negotiated, except as they may especially request and enquire information thereof."

I will repeat that the identity of the notes produced on trial as securities purchased or received by the plaintiff from said Wallace S. Smith, within the time covered by the terms of said bond, and remaining unpaid, the aggregate amount thereof being within the limit expressed in said bond, to-wit, five thousand dollars, was all the proof required in that behalf.

But if I am wrong in the above proposition of law, and if it were necessary that the execution of said notes be proved by the plaintiff, it would then become relevant to examine the plaintiff's fourth assignment of error, to-wit, the excluding of proper evidence offered by plaintiff.

On the trial the plaintiff offered in evidence the deposition of Wallace S. Smith, taken on his behalf, which was admitted. This deposition was taken at the penitentiary, the witness being there confined pursuant to a conviction

and sentence for felony.   The witness, upon his examination in chief, among other things, testified being shown the several notes involved in the controversy, and which had been identified by the witness, Charles West, as hereinfore stated, as the securities purchased from Smith by the plaintiff, and as coming within the guaranty of the bond, and interrogated as to whether he was acquainted with the signatures of the signers of the same, and whether, or not, the said notes were signed in his presence by the persons whose names appeared as the signers thereof.   In each case the witness answered that the note was signed in his presence, by the person whose name appeared as the maker thereof; that he was acquainted with such signature and that it was genuine.   Upon his cross-examination the witness was asked as to each note which he had testified had been signed by the maker thereof, if it was signed and delivered by the maker in the same condition in which it was at the time of testifying?   To which question the plaintiff objected as not being proper cross-examination, and for the further reason that the answer sought is intended to criminate the witness, and that he had a right to object to it for that reason.   Whereupon the witness in each case refused to answer.

Upon the trial, and near the close thereof, the defendants moved to "strike out the deposition of W. S. Smith, as far as it affects the signatures and goes to show the execution of these notes offered in evidence, for the reason that the witness refuses to be cross-examined on the execution of the notes."   Which motion was sustained as to all but the Cavin and Greenfield notes.   Thereupon the plaintiff offered in evidence the several notes above referred to, to which offer the defendants "objected to each of the said notes as immaterial, incompetent, and irrelevant, the signatures of each being denied, and not proven." Which objection was sustained as to each.

Counsel for defendants in error, in their brief, urge in

44

defense of the above ruling of the trial court, that the witness having testified upon his examination in chief that the signatures to the notes were genuine, thereby waived his privilege to refuse to answer the cross-question whether the notes, respectively, were, at the time the signatures were placed upon them, in the same condition that they were at the time of testifying, on the ground that his answer to the latter question might tend to criminate him. To this they cite Rapalje on the Law of Witnesses, 443. Wharton's Crim. Ev., 432. Comp. Stats., 1885, Sec. 339, p. 673. The author first named, at the page cited, states the law as follows:

" The privilege being a purely personal one, the witness may waive it and answer at his peril. . From the nature of the right it may be inferred that he will be at liberty to answer any question at his discretion; and that his consenting to answer some questions ought not to bar his right to demur to others. Such is the English rule, subject, perhaps, to the qualification that he should not be allowed by any arbitrary use of his privilege to make a partial statement of facts to the prejudice of either party. The general American rule is the other way, i. e., if he voluntarily discloses a part of a transaction or conversation tending to criminate him, he waives his privilege, and must answer freely and disclose the whole transaction or conversation; unless the partial disclosure is made under an innocent mistake, or does not clearly relate to the transaction as to which he refuses to testify."

The citation from Wharton, I must say, with due respect to counsel making it, is not applicable to the case at bar.

It is the theory of the defense that the notes above referred to, after having been executed and delivered to Wallace S. Smith by the parties whose names they bear, were, by Smith, raised or altered so as to represent other and greater sums or amounts, and they contend that hav-

ing, when placed on the stand as a witness, testified as to the making or signing of the notes by the makers, he could not refuse to testify as to their alteration, on the grounds that such testimony might tend to criminate himself.

Let us apply the law as laid down in the work cited as above quoted, and see if this position can be sustained. The making and delivery of the notes by the makers was, in each case, a transaction complete in itself. If the amount of the note was raised or altered in the presence of the maker and as a part of the same transaction, then it was an act entirely innocent in itself, and could form the basis of no contention on the part of the makers, nor of anyone else. But that is not the position of the defendants. The theory upon which they sought to cross-examine the witness as to the alteration of the "condition" of the notes is, that after their signing and delivery by the makers thereof, at another time, not necessarily at the same place and as a different and separate *transaction,* they were altered, raised, and their "condition" changed. The witness having submitted to testify as to the signing of the notes, could not, under the American rule as above stated, have refused upon his cross-examination to answer any question as to the time, place, or other matter, being a part of that transaction, but when it was sought to enter upon the investigation of another and distinctly separate transaction by questions, the answers to which would tend to criminate him, could he not, under the rule, refuse to answer? That proposition seems clear.

The section of statute cited lays down the rule substantially the same as it is stated by the author whom we have quoted, and the statute supports the proposition.

As hereinbefore indicated, I doubt the necessity, on the part of the plaintiff, to prove the execution of the notes as a condition to their introduction in evidence for the purpose of fixing the amount due on the bond; but if such

proof was necessary, then the court erred in suppressing the deposition under the consideration.

Having reached the conclusion that the true measure of damages in this case is the aggregate amount or face value of the negotiable securities delivered to the plaintiff by the said Wallace S. Smith, and received by the plaintiff in good faith within the time limited by the terms and conditions of said bond, and remaining unpaid at the time of the commencement of the suit, and not exceeding in the aggregate the sum of five thousand dollars, with interest, the alleged error on the part of the trial court, in refusing to instruct the jury to consider in their verdict the amount of certain property claimed to have been placed by the defendant, Wallace S. Smith, in the hands of his co-defendant, Mayberry, as an indemnity for his liability on said bond, will not be examined.

The judgment of the district court is reversed and the cause remanded to that court for further proceedings in accordance with law.

REVERSED AND REMANDED.

THE other judges concur.