## FORLINI v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit.
June 1, 1926.)

No. 351.

**1. Counterfeiting ⊙⇒11.**

The possession of counterfeit obligations of foreign government is an offense punishable under Criminal Code, § 160 (Comp. St. § 10330), in view of sections 156–161 (Comp. St. §§ 10326–10331), and Const. art. 1, § 8.

**2. Statutes ⊙⇒225.**

To solve ambiguity in statute, reference may be had to prior acts.

**3. Statutes ⊙⇒211.**

Where ambiguity is present, title of act may be considered as affecting meaning of context.

**4. Statutes ⊙⇒200.**

Need of punctuation does not control construction of statute, since courts may disregard punctuation, or punctuate, if need be.

**5. Statutes ⊙⇒181(1).**

Statutes must be construed according to congressional intent, expressed in the enactment.

**6. Criminal law ⊙⇒620(1)—Indictments for possession of forged and counterfeited obligations of foreign government, and for alteration, possession, and utterance of bonds and notes of United States, held properly consolidated for trial (Criminal Code, §§ 148, 151, 160 [Comp. St. §§ 10318, 10321, 10330]).**

Indictment, under Criminal Code, § 160 (Comp. St. § 10330), charging possession of counterfeit and forged obligations of a foreign country, and indictment under sections 148, 151 (Comp. St. §§ 10318, 10321), charging alteration of government bonds and notes, and possession and utterance of such notes, *held* properly consolidated for trial, and testimony and admissions concerning foreign bonds properly received.

**7. Criminal law ⊙⇒535(2)—Defendant's admission held sufficiently corroborated by physical appearance of altered bonds and testimony as to admissions to pretended bank clerk (Criminal Code, §§ 148, 151, 160 [Comp. St. §§ 10318, 10321, 10330]).**

Physical appearance of bonds in evidence, and admissions made by defendant to pretended bank clerk, *held* sufficient corroboration of defendant's admissions, to sustain conviction for possession of counterfeited obligations of foreign country, and for alteration, possession, and utterance of bills and notes of the United States, under Criminal Code, §§ 148, 151, 160 (Comp. St. §§ 10318, 10321, 10330).

**8. Counterfeiting ⊙⇒18.**

Evidence *held* to sustain conviction under Criminal Code, §§ 148, 151, 160 (Comp. St. §§ 10318, 10321, 10330), for possession of counterfeit obligations of foreign government, and for altering, possessing, and uttering bonds and notes of United States.

In Error to the District Court of the United States for the Southern District of New York.

Romeo Forlini was convicted of possessing false and forged counterfeit obligations of a foreign government, and of altering, possessing, and uttering bonds and notes of the United States, and he brings error. Affirmed.

John B. Johnston, of New York City, for plaintiff in error.

Emory R. Buckner, U. S. Atty., of New York City (David P. Siegel and Ralph P. Koenig, Asst. U. S. Attys., both of New York City, of counsel), for the United States.

Before ROGERS, MANTON, and HAND, Circuit Judges.

MANTON, Circuit Judge. The plaintiff in error was charged in two indictments, the first, one of 11 counts, with violations of section 160 of the United States Criminal Code (Comp. St. § 10330), and the second, with 15 counts, violations of sections 148 and 151 of the United States Criminal Code (Comp. St. §§ 10318, 10321). At the trial, they were consolidated, and the plaintiff in error was convicted on all counts. He has sued out this writ, seeking to review this judgment of conviction.

Counts 1 to 11 of the consolidated indictment charge the plaintiff in error, with "intent to utter, pass, and put off, * * * had in his possession a false, forged, and counterfeit obligation and security * * * of a certain foreign government, to wit, a security and obligation of the Italian government, known as 'Debito Pubblico, del Regno d'Italia Consolidato Cinque Per Cento.'"

Counts 12, 14, 16, and 18 charge the plaintiff in error, "with intent to defraud, unlawfully, willfully, and knowingly altered" certain obligations of the United States, to wit, certain bonds and notes of the United States of the Second, Fourth, and Victory Liberty Loans, Nos. 19281, 431952, 147728, and 1–957639.

Counts 13, 15, 17 and 19 charge plaintiff in error, "with intent to defraud, unlawfully, willfully, and knowingly did have and keep in his possession with intent to pass, utter, and publish" the said altered bonds and notes of the United States more particularly referred to in counts 12, 14, 16 and 18 as aforesaid.

Indictment No. C43–659 consists of 15 counts. Counts 1, 4, 7, 10, and 13 charge plaintiff in error, "with intent to defraud, unlawfully, willfully, and knowingly altered" certain obligations of the United States to

wit, certain bonds and notes of the United States of the Third and Victory Liberty Loans Nos. 160572, 160575, 235222, K–351168, and 1–330792.

Counts 2, 5, 8, 11, and 14 charge plaintiff in error, "with intent to defraud, unlawfully, willfully, and knowingly did pass, utter, and publish" and deliver to Edward Connors said altered bonds and notes, more particularly referred to in counts 1, 4, 7, 10, and 13 ·as aforesaid.

Counts 3, 6, 9, 12, and 15 charge plaintiff in error, "with intent to defraud, unlawfully, willfully, and knowingly did have and keep in his possession, with intent to pass, utter, and publish," the said altered bonds and notes of the United States, more particularly referred to in counts 1, 4, 7, 10, and 13 as aforesaid.

The circumstances leading to the arrest of the plaintiff in error with his admissions will be narrated. Apparently suspicious of the plaintiff in error, a special employé of the Secret Service of the government introduced another Secret Service agent to the plaintiff in error on February 10, 1925, as a bank clerk employed in the Central Union Trust Company. The following day the three met, and plaintiff in error told the alleged·employé of the bank that he had $1,000,000 in stolen Liberty Bonds. He asked the clerk to remove certain negotiable securities from the bank and substitute his stolen bonds in their place. He asked for the names of the trust account in which the bonds were, and said he would put the same names on the stolen bonds. On February 13, 1925, the alleged bank clerk met the plaintiff in error and gave him a slip of paper containing the name of the "Estate of John D. McCoy" and the amounts and denominations of some bonds. Three days later the plaintiff in error told the bank clerk the bonds were not ready as yet, and an appointment was made for the following day at a hotel in New York City, where the plaintiff in error had agreed to deliver 15 $1,000 United States Liberty Bonds.

At this time and place the plaintiff in error handed the bank clerk a copy of the Saturday Evening Post containing 5 $1,000 United States Liberty Bonds, and the clerk said he would have the other bonds ready for him at noon. One of the Secret Service employés observed this transaction and accompanied the clerk to the Central Union Trust Company, where they examined the Saturday Evening Post and found 5 $1,000 registered Liberty Bonds in the name of the "Estate of John D. McCoy." These 5 bonds are the sub-

ject of the 15 counts of the indictment. Four of the bonds were offered in evidence and the fifth was marked for identification only. From the Central Union Trust Company the agents went to their office, prepared an envelope with several slips of paper, and inserted it in the same copy of the Saturday Evening Post, and the bank clerk then returned to the hotel, where he met the plaintiff in error and asked him why he had given him only $5,000 in bonds, instead of $15,000. The plaintiff in error said he would deliver to the clerk his share of the money and the balance of the bonds at 5 o'clock at the same place.

Thereupon the plaintiff in error was placed under arrest by two Secret Service agents, who searched him and found a safe-deposit box key, and then all proceeded to the Chelsea Exchange Bank, where the safe-deposit box was located. At first the plaintiff in error refused to open the box, whereupon he was taken to the custom house, where he was interrogated by an agent of the Secret Service Department, and later taken by the agents to the bank, where the box was opened and where the search revealed that it contained $50,000 in United States Liberty Bonds and about 140,000 lire in counterfeit Italian lire bonds. These alleged Italian government bonds are the subject-matter of the first 11 counts of the indictment. They were all offered in evidence. The contents of the safe-deposit box were received in evidence. In the box were found four altered registered bonds, which are the subject of counts 12 to 19. There was also found in the box a book entitled "Lost or Stolen Liberty Bonds," and another entitled "Warning to Bankers," issued by a surety company under its fidelity claim department.

The plaintiff in error signed a statement at the time of the opening of the box under the name of Antonio Fede, which was the name he used in renting the box, which statement set forth the contents of the box. In the course of the statements made by the plaintiff in error, he admitted that he had altered the bonds on the machine of a friend. He explained how he came in possession of the alleged Italian bonds. The government established the alteration of the bonds by the testimony of the Claims Examiner of the Division of Loans and Currency of the Treasury Department. He gave testimony as to the original names under which 5 of the bonds referred to in the indictment were registered. He testified also that there was no record of the name "Estate of John D. McCoy"; also that the bonds represented in

counts 14, 15, 18, and 19 were issued to persons other than the names appearing on these bonds, and there was no record of such names in the department. This testimony was given from the records of the Treasury Department, which records were certified and authorized. There was no defense interposed. [1] It is argued that counts 1 to 11 of the consolidated indictment are not punishable under the laws of the United States. As to these counts, the charge of crime is found under section 160 of the United States Criminal Code (Comp. St. § 10330), which provides:

"*Possession of Counterfeit Foreign Securities.* Whoever, within the United States or any place subject to the jurisdiction thereof, shall have in his possession any false, forged, or counterfeit bond, certificate, obligation, security, treasury note, bill, promise to pay, bank note, or bill issued by a bank or corporation of any foreign country, with intent to utter, pass, or put off the same, or to deliver the same to any other person with intent that the same may thereafter be uttered, passed, or put off as true, or shall knowingly deliver the same to any other person with such intent, shall be fined not more than one thousand dollars and imprisoned not more than one year."

This makes it a crime to have possession of the enumerated false documents. The section provides it to be a crime to have in one's possession "any false, forged, or counterfeit bond, * * * issued by a bank or corporation of any foreign country." The argument of the plaintiff in error proceeds upon the theory that the expression "issued by a bank or corporation of any foreign country" applies only to obligations of a bank or corporation of a foreign government, but it will be observed that the word "bill" is twice used in section 160, indicating a distinction is to be made between the different varieties of bills. "Bill" is not merely an incidental repetition, modified by the same limiting clause. If the construction argued for is valid, it would leave unremedied the offense intended to be punished by this statute. A reasonable construction to be given to this section is that it includes the possession of counterfeit obligations of a foreign government. This construction can be readily agreed to by placing a comma after the word "corporation."

[2] Reference may be had, in the construction of this statute, to prior acts, in order to solve any ambiguity which may exist. Hamilton v. Rathbone, 175 U. S. 414, 20 S. Ct. 155, 44 L. Ed. 219; Ex parte Crow Dog, 109 U. S. 556, 3 S. Ct. 396, 27 L. Ed. 1030. The Act of

May 16, 1884 (23 Stat. p. 22, c. 52), is an act to prevent and punish the counterfeiting within the United States of notes, bonds, and other securities of foreign governments. Section 1 deals with forging or counterfeiting within the United States of bonds, certificates, obligations, or other securities of any foreign government. Section 2 makes it an offense to utter, pass, and put off with intent to defraud any of the obligations referred to in section 1. Section 3 deals with the counterfeiting of bank notes or bills issued by a bank or other corporations of any foreign country and intended to circulate as money. Section 4 makes it an offense to utter, pass, or put off or tender in payment with intent to defraud any of the obligations referred to in section 3. Section 5 is similar to section 160, which we are now considering, with the exception that in section 5 the word "such" appears before "false, forged, or counterfeit." Section 6 deals with the possession unlawfully of plates from which may be printed any security of any foreign government, bank, or corporation.

Under article 1, § 8, of the Constitution of the United States, Congress is given authority and power to define and punish piracies and felonies committed on the high seas and offenses against the law of nations, and under this provision the act of 1884 was held to be constitutional. United States v. Arjona, 120 U. S. 479, 7 S. Ct. 628, 30 L. Ed. 728; United States v. White (C. C.) 27 F. 200. It was held by these authorities that it was an infraction of the law of nations to have foreign securities counterfeited in the United States without any attempt to make it an offense, and that it was incumbent upon this government to make it a criminal offense. [3] The title of the 1884 enactment may be considered, when ambiguity is present, to ascertain the exact meaning of the context of the section. Such is the exception to the rule. Knowlton v. Moore, 178 U. S. 41, 20 S. Ct. 747, 44 L. Ed. 969; United States v. McCrory, 119 F. 861, 56 C. C. A. 373. From this enactment it is clear that the Congress recognized there were two classes of money and currency, to wit, that of a foreign government and that of a bank or corporation authorized by a foreign government, and having the same legal circulation as the currency of the foreign government. It treated with both. Section 5, standing as it does, must be considered with reference to its relation to sections 1 and 2; and sections 1 and 2 refer to bonds, certificates, obligations, bills, and promises to pay, and sections 3 and 4 refer to

bank notes and bills. Section 5 was intended to include all the obligations set forth in the preceding four sections. Such, we think, was the clear intent of that statute.

[4, 5] Since the Act of May 16, 1884, was carried into the United States Criminal Code as sections 156, 157, 158, 159, 160, and 161 (Comp. St. §§ 10326–10331), it was, we think the intent of Congress to make it a crime to have possession of the false foreign security. The need of a comma in the punctuating is not a controlling element of an interpretation. The courts may disregard the punctuation of a statute, or, indeed, repunctuate it, if need be. United States v. Lacher, 134 U. S. 624, 10 S. Ct. 625, 33 L. Ed. 1080; Barrett v. Van Pelt, 268 U. S. 85, 45 S. Ct. 437, 69 L. Ed. 857. Statutes must be construed according to the congressional intent as expressed in the enactment. Ash Sheep Co. v. United States, 252 U. S. 159, 40 S. Ct. 241, 64 L. Ed. 507; United States v. Bowman, 260 U. S. 94, 43 S. Ct. 39, 67 L. Ed. 149.

[6] The consolidation of the indictments made it more expedient to consider the charges made against this plaintiff in error, and it was not prejudicial to his interests to try him upon all the offenses charged. Such a consolidation is to be favored. De Luca v. United States (C. C. A.) 299 F. 741. The transactions leading to the apprehension and charges of crime were connected together. The alleged foreign bonds were found in the safe-deposit box, and the plaintiff in error asked the bank clerk if he could handle any foreign government bonds. The testimony concerning the Italian bonds was therefore admissible, as were the admissions made as to them. The plaintiff in error admitted to the Secret Service agent that the bonds were counterfeit, and the bonds were offered in evidence. The court declined to accept the testimony of an expert whom he thought unable to qualify to prove that the bonds were counterfeit. He instructed the jury that, if they found that the plaintiff in error did not tell the Secret Service agent that the bonds were counterfeit, there was no evidence that they were counterfeit, and the verdict would be for the defendant.

[7] However, we must assume by the verdict that the jury found the plaintiff in error did make this admission to the government agent. The bonds admittedly belonged to the plaintiff in error. The physical appearance of the bonds in evidence, together with the admission and the inquiry of the plaintiff in error from the bank clerk as to whether he could handle foreign bonds, is sufficient to satisfy the rule that some corroboration is necessary, in addition to the admissions of the defendant, to sustain a conviction. Daeche v. United States, 250 F. 566, 162 C. C. A. 582. The physical appearance of the bonds is some independent proof of the corpus delicti. Wagner v. United States (C. C. A.) 8 F.(2d) 581.

[8] There is ample evidence to warrant our sustaining the conviction on all the counts charging an alteration, passing, and possession of the altered bonds.

Judgment affirmed.