## UNITED STATES v. ST. PIERRE.

### No. 107.

Circuit Court of Appeals, Second Circuit.

Dec. 15, 1942.

838

Edward V. Broderick, of New York City, for appellant.

Silvio J. Mollo, and Mathias F. Correa, U. S. Atty., both of New York City (Keith Brown, Asst. U. S. Atty., of New York City, of counsel), for appellee.

Before L. HAND, CLARK, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

St. Pierre, the respondent, appeals from an order of the district court, sentencing him for criminal contempt in refusing to answer a question put to him before a grand jury. He had refused to answer substantially the same question once before and had been sentenced to thirty days' imprisonment; he appealed to this court, and we affirmed the conviction because the record did not contain any evidence tending to prove that he had committed a federal offense. United States v. St. Pierre, 2 Cir., 128 F.2d 979. The grand jury minutes then before us, although they showed that he confessed to having embezzled money entrusted to him by appropriating it instead of delivering it to the person for whom it was intended, did not show that he had taken it outside the State of New York. As this was necessary to a federal

crime, his refusal to disclose the name of the person to whom the money belonged we held to be a contempt. After the sentence had expired, the respondent was again brought before the grand jury, and once more directed to tell the name which he had before refused to disclose, and again he refused. This time, however, it appears that the money which he embezzled he took outside the State of New York, and that supplies the element lacking before. His position is that his testimony before the grand jury was a confession, requiring corroboration in order to make out a case which could go to a jury (Daeche v. United States, 2 Cir., 250 I'. 566); and that since the person from whom he withheld the money would very probably be a corroborating witness, the identification might enable the prosecution to complete its case.

A preliminary question arises at the outset as to the appealability of the order, but the circumstances were precisely the same as in the case of United States v. Cusson, 2 Cir., 132 F.2d 413, handed down December 2, 1942, and we refer to our discussion there for the disposal of the point.

Whatever may have been the original limits of the privilege (Wigmore, § 2261), since Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110, it is settled in federal courts that a witness cannot be compelled to disclose anything that will "tend" to incriminate him, whether or not the answer would be an admission of one of the constitutive elements of the crime. The name of the victim would certainly so "tend"; it will furnish a witness whose testimony will certainly assist the prosecution, whether or not it uses the respondent's confession. He need not therefore invoke the doctrine that a witness's corroboration is necessary to make a case against him, or persuade us that his confession is admissible against him. Unless he waived his privilege by what he had already said, it protected him against divulging the name of his victim, regardless of anything else; and the only issue is that.

Although the opposite was formerly probably the law of England (Dixon v. Vale, 1 Car. & P. 278; East v. Chapman, 2 Car. & P. 570), since the decision of the Exchequer Chamber by a divided court in Regina v. Garbett, 2 Carrington & Kirwan, 474, 495, no disclosure, however full, will effect a waiver of the privilege; the witness may stop where he pleases. In Brown v. Walker, 161 U.S. 591, 597, 16 S.Ct. 644, 647,

40 L.Ed. 819, it was assumed, though not held, that if the witness "discloses his criminal connections" he must "make a full disclosure"; but just what those "connections" must be, was left at large. In Arndstein v. McCarthy, 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138, and McCarthy v. Arndstein, 262 U.S. 355, 43 S.Ct. 562, 67 L.Ed. 1023, the question was presented whether a bankrupt's schedules waived his privilege when he was examined under § 21, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 44, sub. a. It was held that they did not, and that he might refuse to answer as to the disposition of his property. The court apparently treated the schedules and the examination as a single proceeding, else the question of waiver could not have arisen (Wigmore § 2276 (4); p. 451, 3rd Ed.); and the essence of the decision is that "an ordinary witness" does not waive his privilege "where the previous disclosure * * * is not an actual admission of guilt or incriminating facts," (262 U.S. page 359, 43 S.Ct. 563, 67 L.Ed. 1023). It may be, though we doubt it, that the court meant that a witness could not be cross examined about a fact to which he had testified and which only "tended" to criminate, unless it was one of those "ultimate" facts constituting the crime. Certainly—in spite of its citation of Regina v. Garbett, supra (2 Car. & K. 474)—it is clear that the court did not mean to set up the English doctrine. Moreover, it would seem not to have meant that the admission of nothing short of the whole crime would suffice; else it would not have spoken in the disjunctive. However that may be, we need not pass on the point here, for the respondent admitted the whole crime and stands upon the fact that that waives nothing. The only other federal decision we have found is Buckeye Powder Co. v. Hazard Powder Co., D.C., 205 F. 827, in which there was no discussion.

The question has come up a number of times in the state courts which have either held, or assumed as the basis of their rulings, that the disclosure of any act or transaction waives the privilege as to all details and particulars which will elucidate that act and transaction, although it waives nothing else. We cite some of these decisions in the margin.[1] In none of them, unless it be Foster v. People, 18 Mich. 266, is there any suggestion of the condition that the testimony must disclose all or any of the "incriminating facts," if by that is meant a constituent of the crime. Perhaps in Foster v. People, supra, Judge Campbell did have such a condition in mind when he said: "This distinction between the cases where a witness has or has not furnished sufficient evidence to criminate himself, is clearly recognized in Amherst v. Hollis, 9 N.H. 107, and in Coburn v. Odell, [30 N. H. 540], 10 Foster 540, * * * which hold that when he has once made a decisive disclosure, his privilege ceases." There is nothing in the decisions which he cited to bear him out; and "criminate" is not the equivalent of "convict"; but as we have said of McCarthy v. Arndstein, supra, 262 U.S. 355, 43 S.Ct. 562, 67 L.Ed. 1023, it is not important here what he did mean, because if it imposed any condition upon the waiver, the condition was here fulfilled. The respondent here is obliged to take a still more extreme position; he must maintain that before he waives his privilege he must admit not only his guilt, but he must tell all he knows which will aid in securing the evidence necessary to support a verdict. Until he has made a revelation as complete as this he may not be compelled to disclose any of the details of what he has already uncovered. There is not the faintest intimation of such a notion in the books unless it be read into the phrase, "sufficient evidence to criminate" in Foster v. People, supra, 18 Mich. 266.

The law in this country has developed without such irrational refinements; it rests upon the obvious injustice of allowing

[1] Low v. Mitchell, 1841, 18 Me. 372; Amherst v. Hollis, 1837, 9 N.H. 107; State v. Foster, 1851, 23 N.H. 348, 55 Am.Dec. 191; Coburn v. Odell, 1855, 30 N.H. 540; Foster v. Pierce, 1853, 11 Cush. 437, 65 Mass. 437, 59 Am.Dec. 152; Commonwealth v. Pratt, 1879, 126 Mass. 462; Commonwealth v. Trider, 1887, 143 Mass. 180, 9 N.E. 510; Evans v. O'Connor, 1899, 174 Mass. 287, 54 N.E. 557, 75 Am.St.Rep. 316; Ex parte Senior, 1896, 37 Fla. 1, 19 So. 652, 32 L.R. A. 133; Samuel v. People, 1896, 164 Ill. 379, 45 N.E. 728; Stevenson v. Baker, 1932, 347 Ill. 304, 179 N.E. 842; Foster v. People, 1869, 18 Mich. 266; State of Minnesota v. Nichols, 1882, 29 Minn. 357, 13 N.W. 153; Lombard v. Mayberry, 1888, 24 Neb. 674, 40 N.W. 271, 8 Am.St.Rep. 234; Ex parte Park, 1897, 37 Tex.Cr.R. 590, 596, 40 S.W. 300, 66 Am.St.Rep. 835; Ex parte Adams, 1915, 76 Tex.Cr.R. 277, 174 S.W. 1044; People v. Freshour, 1880, 55 Cal. 375; American Savings & Loan Ass'n v. Sawicki, 1929, 150 Wash. 436, 273 P. 530, 275 P. 717.

a witness, who need not have spoken at all, to decide how far he will disclose what he has chosen to tell in part, and how far he will refuse to let his veracity be tested by cross questioning. In adversary cases it is hard to see how a trial could go on, if this were allowed. Certainly the party who has called the witness should not profit by what he says, and it is small relief for the judge to admonish the jury to disregard what they have heard. The witness has no just claim for such tenderness, unless he has not learned of his privilege before he consents to speak, and not then if the law charges him with knowledge of it anyway. It must be conceded that the privilege is to suppress the truth, but that does not mean that it is a privilege to garble it; although its exercise deprives the parties of evidence, it should not furnish one side with what may be false evidence and deprive the other of any means of detecting the imposition. The time for a witness to protect himself is when the decision is first presented to him; he needs nothing more, and anything more puts a mischievous instrument at his disposal. · It is true that this mischief is less flagrant in an inquisitorial proceeding like an inquest before a grand jury; but the witness has no better claim to protection in one case than in the other; and his protection is the only relevant weight in the scale. The result of using this, like any other privilege, is to deprive people of evidence which would be otherwise available; at best a disastrous necessity, for disputes ought to be settled so far as they can be by resort to the whole truth; and when the only excuse for darkness ceases, it is shocking to shut out the light. Since none of the decisions suggest any distinction between adversary and inquisitory proceedings, surely we should not resort to so unnecessary and deplorable an innovation.

 We need go no further in the case at bar than to hold that, at least after a witness has confessed all the elements of the crime, he may not withhold the details; for it is hardly necessary to labor the point that even in the narrowest sense the disclosure of the identity of the respond-

ent's victim was only a detail of what he had already confessed. Cases may perhaps arise where the testimony put forward as a waiver was so vague or general as to raise a question whether specifications can be said to be truly in amplification of it, but no such embarrassment exists here.

Order affirmed.

FRANK, Circuit Judge (dissenting).

1. St. Pierre, not as a voluntary witness but under subpoena, confessed before a federal grand jury that he had embezzled money from a person not known to the government, and whose name he did not divulge, and also that he had carried that money across state lines. When asked, before the grand jury, for the name of that person, he refused to answer, asserting his constitutional privilege. Unless St. Pierre is compelled to answer that question, the government, if he is tried for violating the National Stolen Property Act, 18 U.S.C.A. § 413 et seq.,[1] cannot make out a case against him which will go to the jury, and he cannot, therefore, be convicted and punished for that crime. But, if he is compelled to answer the question, he will put the government in possession of evidence which will enable the government, in such a proceeding, to go to the jury. So it appears that to compel him to answer that question is to compel him to give evidence without which his punishment for that crime is impossible and with which it becomes possible.

2. To make it clear that such is the situation here, it is well to note the following: (a) A confession before the grand jury is not a "judicial" confession.[2] (b) Therefore, the confession cannot, without extrinsic corroboration, be used against St. Pierre. The corroborative evidence may be slight in weight, but there must be some such evidence, even if "circumstantial," as to the corpus delicti. Daeche v. United States, 2 Cir., 1918, 250 F. 566; Cohen v. United States, 2 Cir., 1923, 288 F. 835, 836; Litkofsky v. United States, 2 Cir., 1925, 9 F.2d 877, 880; Forlini v. United States, 2 Cir., 1926, 12 F.2d 631, 634;[3] Forte v.

---

[1] That statute makes it a crime to transport embezzled money in interstate commerce.

[2] United States v. Williams, Fed.Cas. No. 16,707; State v. Stevenson, 98 Or. 285, 193 P. 1030, 1032; State v. Bowman, 294 Mo. 245, 243 S.W. 110, 166; Mularkey v. State, 199 Wis. 269, 225 N. W. 933, 934; Stewart v. State, 41 Okl.

Cr. 117, 271 P. 959; 2 Wharton, Criminal Evidence (11th ed., 1935) 967.

[3] Judge Learned Hand who wrote the opinion in the Daeche case sat in the Forlini case where it was indicated, citing the Daeche case, that there must be "some independent proof of the corpus delicti."

United States, 68 App.D.C. 111, 94 F.2d 236, 127 A.L.R. 1120. (c) Here the government, on the record before us, has no such corroborative evidence. For its evidence, other than the confession, will show merely that St. Pierre traveled from New York to Canada, and return, accompanied by a woman, and with $5,000 in cash in his possession. Such evidence, standing alone, can give rise to no reasonable inference, however slight, of the violation of the National Stolen Property Act. (d) If, however, St. Pierre is compelled to disclose the name of the person from whom he embezzled, the government, in all likelihood, will then have sufficient evidence to go to the jury; for then, by calling the embezzlee as a witness, either (1) it can go to the jury without the use of the confession or (2) it can go to the jury by obtaining from that witness the corroborative evidence necessary to make the confession admissible.

3. Accordingly, the problem here is this: Can a witness, under subpoena before a grand jury, be compelled, against his objection, based on the constitutional privilege against self-incrimination, to answer a question when (a) without the answer to that question it is not possible for the government to convict and punish him for the commission of a crime and (b) the answer to that question will probably make possible such conviction and punishment? I think that we should say No.

My colleagues here arrive at the contrary conclusion. They do so by saying that St. Pierre, because of his confession, "waived" the privilege. The character of an effective waiver or surrender of the privilege thus becomes important.

In discussing the doctrine of waiver or surrender of the privilege, one of two positions must be adopted: (a) The first position is that there is a rational relation between the nature of the privilege and what constitutes a waiver or surrender of the privilege; the conduct by a witness amounting to abandonment of the privilege must be plainly inconsistent with his assertion of the privilege.[4] (b) The alternative position is that what amounts to a surrender or waiver has no rational relation to the privilege.

The latter position, of course, is so arbitrary that we should not adopt it unless the precedents .leave us no other choice. There are no authoritative precedents calling for such an arbitrary and irrational attitude. And, as my colleagues nowhere state that they have adopted it, I assume that they have not.

Accordingly, I read the majority opinion here as based on the position that there must be a rational and not an arbitrary relation between (1) the character and purpose of the privilege and (2) the conduct of the witness which constitutes a surrender or waiver. On that basis, the discussion in my colleagues' opinion of what constitutes a surrender or waiver of the privilege must be taken as implying their conception of the nature of the privilege itself. And, since they hold that there is a waiver when a witness gives evidence involving the disgrace of admitting the commission of a crime, even when that evidence does not make possible his punishment, the necessary implication of my colleagues' opinion is this: The privilege is not that of freedom from compulsion to give testimony which will lead to one's punishment for crime; the privilege is that of freedom from compulsion to give testimony which will involve the disgrace of admitting to criminal conduct although that testimony does not put one in danger of punishment.

The decisions concerning the privilege, and its history, demonstrate the contrary. Not mere disgrace but punishment is the key concept. The existence of a likelihood of punishment is indispensable to the existence of the privilege, is its basic rationale. Again and again, in describing the privilege, the courts use such expressions as "protection [to the witness] against being brought by means of his own evidence within the penalties of the law,"[5] or "he might be convicted, when otherwise, and if he had refused to answer, he could not

---

4 Cf. cases relating to "waiver" generally to the effect that acts constituting a waiver of a right must be inconsistent with the existence of the right. Champion Spark Plug Co. v. Automobile Sundries Co., 2 Cir., 1921, 273 F. 74, 80, 81; Cable v. United States Life Ins. Co., 7 Cir., 1901, 111 F. 19, 31; Pokegama

Sugar Pine Lumber Co. v. Klamata River Lumber & Improvement Co., C.C., 96 F. 34, 54; Smiley v. Barker, 8 Cir., 1897, 83 F. 684, 687.

5 Mason v. United States, 244 U.S. 362, 365, 366, 37 S.Ct. 621, 622, 61 L.Ed. 1198, quoting Cockburn, Ch. J., with approval.

possibly have been convicted." [6] Where the possibility of punishment is absent, the privilege vanishes—as where, for instance, a statute affords "absolute immunity against future prosecutions for the offence to which the question relates," or a pardon or the running of the statute of limitations completely shelters the witness from punishment for the crime.[7]

History also shows that not the disgrace of admitting criminal conduct but the danger of punishment is at the heart of the privilege.[8] As we know, that privilege was a consequence of the struggles of the Puritans, in 17th century England, with the ecclesiastical court, the High Commission, which sought to punish them for violations of the law against heresy. The Puritans at that time never denied that that law was valid. But they resisted the efforts of the High Commission which was using the oath ex officio to compel them to give evidence against themselves of that crime, evidence indispensable to their conviction and punishment as law-breakers. The Puritans, who insisted that the oath ex officio was unlawful, considered it no disgrace to commit the crime of heresy; they were proud of their heresy; if, without fear of punishment, they could have confessed to what the law denounced as heretical acts, they would have been glad to do so. What they sought to avoid in their attacks on the procedures of the High Commission was punishment for violation of a substantive law which they considered abhorrent. No one in those days dreamed of saying that self-incrimination was wrongful at common law. But the beginning of the Puritan Revolution brought about the destruction by statute, in 1641, of the High Commission and, with it, of the offensive oath. The sentiment against the oath spread far, and, before long, the privilege against self-incrimination was recognized at common law.

When, in 1789, that privilege was incorporated, through the Fifth Amendment, in our Constitution, it was still aimed at prevention of punishment of a witness on the basis of his own compelled testimony.

Eighteen years later, in 1807, Marshall, C. J., in the trial of Aaron Burr,[9] using language not inapposite in the case at bar, said, "It would seem, then, that the court ought never to compel a witness to give an answer which discloses a fact that would form a necessary and essential part of a crime which is punishable by the laws"; speaking of facts which may not be elicited, he went on to say, "That fact of itself might be unavailing, but all other facts without it would be insufficient. While that remains concealed within his own bosom he is safe; but draw it from thence, and he is exposed to a prosecution." [10]

4. It is then, well-settled that the object of the privilege is protection against punishment, not prevention of compulsory disclosure of criminal conduct involving disgrace but without punishment. Accordingly, testimony by a witness, given without objection, leading to disgrace by an admission of criminal conduct, cannot alone constitute a waiver of the privilege. Before there is such a waiver, the witness must go further, and, without objection, testify to facts which put him in danger of punishment. If the witness has merely gone to the point of disgracing himself by the admission of criminal conduct, then a compulsory disclosure of further facts which will put him in danger of punishment cannot reasonably be said to be the disclosure of mere "details."

5. All the cases center about the punishment factor. It would seem that the not-too-well disguised criticism, in my colleagues' opinion, of the remarks of the Supreme Court in Brown v. Walker, 161 U.S. 591, 597, 16 S.Ct. 644, 40 L.Ed. 819, in Arndstein v. McCarthy, 254 U.S. 71, 41 S. Ct. 26, 65 L.Ed. 138, and in McCarthy v. Arndstein, 262 U.S. 355, 369, 43 S.Ct. 562, 67 L.Ed. 1023, stems from my colleagues' failure to keep their eye on that pivotal factor of punishment. And it is, I think, because of their disregard of that factor that they hold that a decision for St. Pierre here would be an "irrational refinement" of the privilege, and that an answer, with-

---

[6] See, e. g., *Counselman v. Hitchcock*, 142 U.S. 547, 564, 12 S.Ct. 195, 199, 35 L.Ed. 1110; Brown v. Walker, 161 U.S. 591, 594, 16 S.Ct. 644, 40 L.Ed. 819.

[7] See cases cited in preceding note.

[8] See, e. g., Usher, The Rise and Fall of the High Commission (1913); Usher, The Reconstruction of the English Church (1910); Wigmore, Evidence (3d ed.) § 2250; Corwin, The Supreme Court's Construction of the Self-Incrimination Clause, 29 Mich.L.Rev. (1930); cf. Wood v. United States, App.D.C., 128 F. 2d 265, 271, 141 A.L.R. 1318.

[9] United States v. Burr, 25 Fed.Cas. pages 38, 40, No. 14,692e.

[10] This language is quoted with approval in Counselman v. Hitchcock, 142 U.S. 547, 565, 566, 12 S.Ct. 195, 35 L. Ed. 1110.

out which his punishment is impossible, and with which he will be put in jeopardy, would be the disclosure of "only a detail of what he has already confessed."

6. Only if that pivotal punishment factor is borne in mind do the Supreme Court decisions dealing with the so-called "waiver" of the privilege become intelligible. In Arndstein v. McCarthy, supra, and McCarthy v. Arndstein, supra, the Supreme Court, when deciding that there had been no such waiver, twice cited with approval (to the annoyance of my colleagues) the case of Foster v. People, 18 Mich. 266. There Judge Campbell said that the test of whether there has been a "waiver" is whether the witness "has or has not furnished sufficient evidence to criminate himself," and that the waiver is effective and the privilege gone when and only when the witness "has once made a decisive disclosure." What "criminate" and "decisive" mean in that context seems to puzzle my colleagues. But there is no puzzle if punishment is recognized as the key factor. Judge Campbell, indeed, made clear his meaning, for, in the same context, he uses, interchangeably with "criminate," the phrases "convicted himself" and exposing himself "to a criminal charge." "Criminate" (as the 17th century Puritans and our successful 18th century Bill of Rights advocates well knew) means to be in danger of punishment. A witness has not "criminated" himself and has not made a "decisive" disclosure unless and until he has, without his objection, given evidence, bearing on his commission of a crime, which will make it possible for the government to punish him for that crime through the use of that evidence.

7. The nature of "decisive" testimony constituting a "waiver" is illuminated by the decisions relating to the so-called immunity statutes. It has often been held that the privilege is not, by such a statute, removed one inch beyond the precise extent of the immunity from punishment granted by the statute. The witness is required to give evidence which bears on his commission of the crime for which, under the immunity statute, he cannot be punished; but he cannot be constitutionally compelled to give any evidence which will tend to lead to his conviction and punishment for a crime from which the immunity statute does not completely exculpate him.[11]

To high-light the issue here, let us suppose that a section of the National Stolen Property Act provided substantially as follows: "No one can be convicted of the crime of transporting embezzled property in interstate commerce on the basis of his own evidence admitting the commission of that crime unless he also testifies to the name of the person from whom the property was embezzled." Clearly, under such a statutory provision, a witness who gave exactly the testimony given by St. Pierre here could not be compelled, against his objection, to reveal the name of the person whose money he had unlawfully withheld, because, absent his evidence as to the name of that person, he could not be punished, while his "decisive" testimony, as to that name, would make possible his punishment. And so here, there is no "waiver" because St. Pierre has not yet "criminated" himself. Unless the doctrine of "waiver" is utterly arbitrary and irrational—unless, that is, it is unrelated rationally to the nature of the privilege—the waiver, surrender, or self-removal of the privilege by the witness, must, like the removal resulting from an immunity statute, directly affect the punishment. An immunity statute cancels the privilege because it removes the punishment; a "waiver" cancels the privilege because the witness creates the danger of punishment by giving testimony, without his objection, which can be used against him to convict him.

8. It is well settled, and this court has recently held,[12] that a witness may properly refuse to answer a question on the ground that the answer will incriminate him, even though the question on its face is harmless, where the setting is such that the answer would be "a possible step in the disclosure of a crime." A witness may, therefore, at the beginning of a series of dangerous questions, perceiving where they may lead, assert the privilege. If, however, he fails to do so early in the course of questioning and, although he might then have objected, answers some questions which may have a tendency to incriminate him, those answers do not deprive him of the privilege of later refusing to answer further questions which more clearly

---

[11] Counselman v. Hitchcock, supra; Brown v. Walker, supra.
[12] United States v. Cusson, 2 Cir., Dec. 2, 1942, 132 F.2d 413; see also United States v. Weisman, 2 Cir., 111 F.2d 260, 262, 263.

put him in danger of punishment. That plainly is the doctrine of McCarthy v. Arndstein, supra.[13] There, in an examination of a bankrupt, he had answered some questions, which made "partial disclosures" and which presumably he might have refused to answer because they tended in the direction of subjecting him to danger of punishment. The court held that the fact of his failure to object to those questions and of his having made "partial disclosures" did not deprive him of the right to answer subsequent questions which went still further and more directly into the danger zone. In the instant case, St. Pierre doubtless could successfully have asserted his privilege long before he admitted that he had embezzled property and transported it in interstate commerce. But his failure to do so cannot deprive him of the privilege of stopping at that point where it became obvious that an answer to the further question as to the name of the embezzlee would put him in danger of punishment, since his previous answers had not yet created a situation where the government could, on the basis of his earlier answers and other evidence available to it, procure his conviction and punishment.

9. The majority opinion, in support of its conclusion that St. Pierre waived or surrendered the privilege, cites cases (several of which contain merely dicta on the subject) which are, and have been recognized to be, significantly different from the instant case. The facts in those cases may be summarized as follows: In a suit to which the witness is not a party, he is called to testify by one of the parties and, without objection, gives testimony which obviously will aid the party who called him; his testimony, thus given without objection, tends to show his own participation in a crime.[14] It is held in some of the cited cases that, in those circumstances, in fairness to the other party to the suit, the witness can then be required, over his objection, to go further and give the "details" of the criminal transaction, but cannot be required to go into matters not germane to those concerning which he had previously testified.[15] In most of such cases there are two elements: (a) The witness, without objection, has given testimony in a suit between two other persons and knowingly in aid of one of those persons; accordingly, he is not permitted by his conduct to create injustice to the other party which would result if that party were unable to examine the witness further in order to show his lack of credibility or that the full story, if told, would not weigh against that party. As it is sometimes put, "A witness has no right, under pretence of a claim of privilege, to prejudice a party by a one-sided or garbled narrative," and "should not be allowed, by any arbitrary use of his privilege, to make a partial statement of facts to the prejudice of either party."[16] And stress is sometimes laid on the fact that the witness, when thus giving testimony favorable to one party, "knows in the beginning that his testimony in the case must expose him to a criminal charge."[17] (b) Even in such cases, it must first be shown that the witness has, to some extent, crossed the line to the point where he has already put himself in danger of punishment through the use of his own testimony.[18]

The leading English case, Regina v. Garbett, 2 Cox Cr.Cas. 448, 2 Car. & K. 474,[19] although contrary to the American cases to which I have just referred, is nevertheless illuminating. There Garbett, in a civil action between Bragdon and

---

[13] In referring to this case, my colleagues erroneously state, I think, that the court treated the schedules and the examination as if they were a single proceeding; McCarthy v. Arndstein, 262 U. S. 355, 43 S.Ct. 562, 67 L.Ed. 1023, was a second appeal, and there, as distinguished from the earlier appeal, the problem was whether questions answered by the bankrupt earlier in his examination constituted a waiver.

[14] My colleagues are, I think, in error when they state that none of the cases they cite suggests any distinction on the ground that the witness has given testimony in an adversary proceeding favorable to one side.

[15] As to the last qualification, see, e.

g., Low v. Mitchell, 18 Me. 372, 374; Evans v. O'Connor, 174 Mass. 287, 54 N. E. 557, 75 Am.St.Rep. 316; Lombard v. Mayberry, 24 Neb. 674, 675, 691, 40 N.W. 271, 8 Am.St.Rep. 234.

[16] Foster v. People, 18 Mich. 266, 275; see also Coburn v. Odell, 30 N.H. 540, 556; Foster v. Pierce, 11 Cush. 437, 65 Mass. 437, 439, 59 Am.Dec. 152.

[17] Foster v. People, supra; Coburn v. Odell, 30 N.H. 540, 556; cf. Ex parte Park, 37 Tex.Cr.R. 590, 40 S.W. 300, 302, 66 Am.St.Rep. 835.

[18] Foster v. People, supra; cf. Amherst v. Hollis, 9 N.H. 107.

[19] The report in 2 Cox Cr.Cas. is somewhat more ample.

Booth, to which Garbett was not a party, appeared as a witness and gave evidence favorable to Booth, the defendant. In the course of his testimony, he disclosed facts which tended to show that he was involved in a forgery. The court then compelled him over his objection, on cross-examination by counsel for the plaintiff, to answer the direct question whether he had committed a forgery. Subsequently he was put on trial for that crime, and, in that criminal trial, the question arose as to the admissibility against him of his compelled answer in the earlier civil suit. The sole argument made by the government for admissibility of that evidence was that Garbett, in the civil action, had waived his privilege because he had knowingly given testimony which favored one side.[20] Lord Denman who apparently favored the admission of the evidence, in a colloquy asked: "Where a witness states, in general terms, what will entitle his friend to a verdict, and is then asked as to the particulars of the transaction, can he, by claiming this privilege, prevent the other side from knowing those particulars, which may have a very important effect in contradicting or explaining the general evidence he had previously given?"

Regina v. Garbett has been twice cited with approval by our Supreme Court.[21] That does not necessarily mean that the rule of that case has, without qualification, been adopted by the Supreme Court, although it does go to show that that court is not inclined to narrow the privilege or broaden the doctrine of waiver. But, even assuming that the Garbett case is wholly wrong, and that contrary American decisions state the correct rule, those cases have no application here. For, as my colleagues themselves recognize, the factor of unfairness to one party to the suit is not here present; as they themselves note, the instant case is not one in which it can possibly be said that St. Pierre's testimony thus far given was (to quote the majority opinion) such as to "furnish one side with what may be false evidence and deprive the other of any means of detecting the imposition." Even if we were to ignore the fact that St. Pierre's testimony was not given in an adversary suit, but in an investigatory grand jury proceeding, there is nothing in the record before us to show that his testimony, as thus far given, is favorable to anyone, or that his failure to answer the question here under consideration, would prejudice the government in its efforts to prosecute anyone other than St. Pierre himself.

I agree with my colleagues that, in cases like Regina v. Garbett, there is room for saying that, where a witness testifies knowingly in aid of one party to a suit, a right to assert the privilege to bar further questioning by the other party may put at the disposal of the witness a "mischievous instrument." But in the case now before us there is no such mischief. The sole mischief here, if there is any, inheres in the constitutional privilege itself. And it should not be forgotten that the privilege arose out of Puritan opposition to compulsory disclosures not in adversary suits

---

[20] In the course of the argument for the government, it was said "It would be monstrous that he should be allowed to state just enough *to benefit the party he came to serve,* and no more * * *; to make what was intended for his protection an engine of falsehood and deception. He can have no privilege to garble the evidence to the unfair benefit of one party, and the equally unfair injury of the other * * * He should not be allowed by an arbitrary use of his privilege to make a partial statement of facts, to the prejudice of either party * * * Can there be a doubt * * * that Garbett had gone so far as to render it necessary to the purpose of justice that he should be called upon to state the whole matter? He was put into the box, the question being, whether a certain bill of exchange is in the handwriting of the defendant. *He is in court, and knows what is going on.* He states facts which, if true, are only consistent with his having forged the bill himself; and it is not until he is pressed with the question 'Is it a forgery,' that he asks for the protection of the court and is told he must answer. He had hitherto answered every question that had been put to him without remonstrance, and the counsel for the plaintiff had a right to go into all the other circumstances, for the purposes of explanation * * * This is not a case in which there will be any difficulty in drawing the line, since *the witness was fully aware of the evidence he was about to give.* * * *" (Emphasis added.)

[21] Arndstein v. McCarthy, 254 U.S. 71, 72, 41 S.Ct. 26, 65 L.Ed. 138; McCarthy v. Arndstein, 262 U.S. 355, 358, 359, 43 S.Ct. 562, 67 L.Ed. 1023.

but in preliminary inquisitional proceedings,[22] and that, in the instant case, the question was put in a grand jury room where the witness is not permitted to have his counsel present.

Buckeye Powder Co. v. Hazard Power Co., D.C.Conn., 205 F. 827, cited in the majority opinion, is, I think, not in point. There, in a treble damage suit under the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, a witness, in answer to a question, stated, without objection, that he had written an article (which was in evidence) adversely reflecting upon the plaintiff. He then objected to answering further questions concerning his having written the article, on the ground that the answers might expose him to criminal prosecution for libel. The court held that, as he had already admitted writing the article, he had waived his privilege.

Of course there is no need to consider those cases in which a person himself on trial in a criminal proceeding voluntarily becomes a witness; for it is well settled that (to state the rule generally) by taking the witness-stand the defendant in a criminal suit abandons his privilege as to any matters in issue.[23]

10. In the proceedings below, St. Pierre was denied access to the grand jury minutes. In the light of our decision in United States v. St. Pierre, 2 Cir., 128 F.2d 979, it was therefore necessary for him, in order to raise the question of his privilege, to show, in some other way, that he might be charged with a federal offense. To make that proof, he took the stand before the trial judge; his testimony was there considered as a narrative of his testimony before the grand jury. In those circumstances, it cannot fairly be said that, by thus testifying before the trial judge, he waived his privilege. Cf. United States v. Zwillman, 2 Cir., 108 F.2d 802, 803, 804.[24]

11. Up to now I had been discussing "waiver." There is, however, the following phase of this case, not at all considered in the majority opinion, as to which waiver is irrelevant. Since, as above noted, a grand jury proceeding is not "judicial," St. Pierre's confession cannot, under the due process clause, be used in a criminal proceeding against him unless it was voluntary.[25] The burden of showing that it was voluntary is on the government,[26] and it has made no such showing here.[27] We should, therefore, deal with this case on the assumption that the confession cannot be used against St. Pierre. But we can take the facts disclosed in the confession into account in examining the "setting" to see whether his disclosure of the embezzlee's name will tend to incriminate him. If we do so, it is apparent that the answer will have that forbidden effect, for it will give the government such leads that, without using the confession, it can make out a case against him. Accordingly, on that basis alone, under the authority of our recent decision in United States v. Cusson, 132 F.2d 413, December 2, 1942, we should reverse.

12. To avoid misunderstanding, I think it desirable to disclose the springs of my dissent. The following remarks are not to be taken as at all directed against my colleagues, to whom they do not apply, but as designed to make clear my own approach

[22] Cf. Wood v. United States, App.D. C., 128 F.2d 265, 271, 141 A.L.R. 1318.

[23] See, e. g., Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054.

[24] In any event, if this testimony constituted a waiver, it was given *after* his refusal to answer the question asked by the grand jury and, therefore, he cannot be punished for that prior refusal.

[25] Ziang Sung Wan v. United States, 266 U.S. 1, 15 and note 4, 45 S.Ct. 1, 4, 69 L.Ed. 131; Powers v. United States, 223 U.S. 303, 314, 32 S.Ct. 281, 56 L. Ed. 448; Brown v. Mississippi, 297 U. S. 278, 56 S.Ct. 461, 80 L.Ed. 682; Chambers v. Florida, 309 U.S. 227, 60 S. Ct. 472, 84 L.Ed. 716; Canty v. Alabama, 309 U.S. 629, 60 S.Ct. 612, 84 L. Ed. 988; Lomax v. Texas, 313 U.S. 544, 61 S.Ct. 956, 85 L.Ed. 1511; Vernon v. Alabama, 313 U.S. 547, 61 S.Ct. 1092, 85 L.Ed. 1513; Ward v. Texas, 316 U. S. 547, 550, 555, 62 S.Ct. 1139, 86 L. Ed. 1663; cf. People v. O'Bryan, 165 Cal. 55, 130 P. 1042, 1043; State v. Thornton, 245 Mo. 436, 150 S.W. 1048; State v. Brown, 2 Boyce, Del., 405, 80 A. 146; Oliver v. State, 81 Tex.Cr.R. 529, 197 S.W. 185; Williams v. State, 88 Tex.Cr.R. 87, 225 S.W. 177.

[26] Litkofsky v. United States, 2 Cir., 9 F.2d 877, 880; Harrold v. Oklahoma, 8 Cir., 169 F. 47, 53, 17 Ann.Cas. 868.

[27] Even if the burden were on St. Pierre, he was denied the opportunity of carrying it, as the court below denied him access to the grand jury minutes. Cf. United States v. Zwillman, 2 Cir., 108 F.2d 802, 803, 804.

to the problem and to indicate why I disagree with certain critics of the privilege.

(a) Those critics, regarding that privilege as pernicious and knowing that it is difficult to procure the repeal of the constitutional provision which confers it, urge the courts to eliminate it by emasculating interpretations. Any judges who do not readily comply with that suggestion they call "reactionary."

It is easy to caricature the privilege. I recall the case of a witness who, when asked by the judge why he refused to answer a question, replied, "Because my lawyer tells me I'm a crook." I have no quarrel with those who assert that the constitutional guaranty of freedom from unreasonable searches and seizures is, at least today, far more important for the preservation of democracy, and far more justifiable on rational grounds, than the constitutional privilege against self-incrimination. But it is not, I think, the business of judges, when deciding cases,[28] to consider the desirability of constitutional provisions. Those who urge judges to gut the privilege by narrowing constructions, saying that it is based on a foolish sentimental desire to protect criminals, forget that the 17th century Puritans whose efforts gave rise to it wanted to protect themselves from the effective enforcement against them, through their own testimony, of then valid criminal laws, and that the Americans who wrote the privilege into our constitution were not stupid men but sagacious persons who, with knowledge of what they were doing, unquestionably intended to afford just that protection to persons whom the government might seek to punish for crimes.

The privilege is still in our Constitution whether we like it or not, and whether or not we call it a foolish sentimental safeguard of criminals. I happen to think that there is more to be said for the reasonableness of the privilege than its harshest critics will admit, but this is not the place to come to its defense on rational grounds.[29] For, reasonable or unreasonable, it is part of the Constitution which we, as judges, took an oath to enforce. Of course, there is need for differentiation in judicial attitudes towards the specific and the general clauses of the Constitution; with respect to the latter, it has been wisely recognized, beginning with John Marshall, that pliancy in interpretation is necessary if the Constitution is not to act as a strait-jacket; and the Supreme Court, accordingly, has been unwilling, in interpreting such clauses, to be bound by its own precedents to the same extent as in other legal provinces.[30] That differentiation is pertinent here. For, as the Federalist shows, a majority of the Constitutional Convention opposed the inclusion in the Constitution of specific provisions along the lines of a Bill of Rights, in part because they wanted the Constitution, in general, to be vague in its requirements. What Judge Hough[31] has called the "convenient vagueness" of phrases like "due process," "interstate commerce," or "impairment of the obligation of contracts," has been regarded as wisely permitting "adaptive" interpretations to meet changing national needs.[32]

---

[28] Judges, of course, on or off the bench, may properly criticize and urge the amendment of constitutional provisions or changes in statutes or common law rules. See the work of many of our ablest judges in preparing the A. L. I. Restatements or the A. L. I. Code of Evidence. Cf. Hough, J., in United States Asphalt Refining Co. v. Trinidad Lake Petroleum Co., D.C., 222 F. 1006, and L. Hand, J., in Parke-Davis & Co. v. H. K. Mulford Co., C.C., 189 F. 95, 115; Cardozo, A Ministry of Justice, 35 Harv. L.Rev. 113 (1921).

[29] Cf. Wigmore, Evidence (3d ed.) § 2251.

It is said that the privilege interferes importantly with enforcement of criminal laws. It has not, however, been shown that, in England, where the privilege is perhaps broader than here, "law enforcement" is less efficient.

[30] See, e. g., the remarks of Chief Justice Stone in Graves v. Schmidlapp, 315 U.S. 657, 62 S.Ct. 870, 86 L.Ed. 1097, and his comments as to "specific" constitutional provisions in United States v. Carolene Products Co., 304 U.S. 144, 152 note 4, 58 S.Ct. 778, 82 L.Ed. 1234.

[31] Hough, Due Process of Law Today, 32 Harv.L.Rev. 218 (1919).

[32] Corwin, Judicial Review in Action, 74 U. of Pa.L.Rev. 639 (1926); McCulloch v. Maryland, 4 Wheat. 316, 405, 4 L.Ed. 579; Pensacola Tel. Co. v. Western Union Co., 96 U.S. 1, 24 L.Ed. 708; Noble State Bank v. Haskell, 219 U.S. 104, 115, 31 S.Ct. 186, 55 L.Ed. 112, 32 L.R.A.,N.S., 1062, Ann.Cas.1912A, 487. Note the recurrent use of the phrase, "the gradual process of judicial inclusion and exclusion"; Davidson v. City of New Orleans, 96 U.S. 97, 104, 24 L.Ed. 616; State of Washington v. W. C. Daw-

In Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 443, 54 S.Ct. 231, 242, 78 L.Ed. 413, 88 A.L.R. 1481, Chief Justice Hughes said, in speaking of the contracts clause, "If by the statement that what the Constitution meant at the time of its adoption it means today, it is intended to say that the great clauses of the Constitution must be confined to the interpretation which the framers, with the conditions and outlook of their time, would have placed upon them, the statement carries its own refutation."[33] Where, however, a constitutional provision, like the one here under consideration, had a fairly clear and precise meaning when it was adapted, and was not intended to be vague, then the Supreme Court has given it an "historical interpretation."[34]

It is possible to argue that the literal language of the Fifth Amendment shows an intention to make the privilege operative only when a question is asked in a criminal proceeding against the witness; but the Supreme Court long ago decided that the intention of those words was to incorporate the entire common law privilege, and, consequently, it is not open to this court to say that the Amendment has a narrower meaning. Taking the constitutional provision then (as we must), as having been designed to include the common law privilege, I think that judges are dangerously and unwisely going beyond their legitimate functions if, because of their personal beliefs that that provision was originally unfortunate or is now outmoded, they take it on themselves to frustrate its meaning and purpose by crippling interpretations.

It is our sworn obligation not to cut into this privilege by decisions which will allow government prosecutors to circumvent it and to defeat the plain purpose of those who lawfully inserted it in the Constitution. Judges should not convert themselves into constitutional conventions. They may properly, within appropriate limits, avail themselves (as the Supreme Court Justices often have done)[35] of the elasticity of these constitutional phrases purposely left elastic, but they should not tamper with those phrases not designed to be flexible. Strangely enough, those who are most opposed to any changes in judicial constructions of those designedly elastic clauses of the Constitution are often the most vigorous in their demands that the courts should eviscerate the specific and relatively inelastic self-incrimination clause.

(b) Since I think that the fullest practicable disclosure to the courts of all important evidence bearing on the facts of cases is essential to the administration of justice, I agree heartily with critics of all privileges accorded witnesses that each of those privileges needs periodic examination to determine whether the policy which prompted it is sufficient to outweigh its interference with access to such evidence. Indeed, I take far more seriously than do many of those critics the idea that, if courts of justice are to do justice, it is imperative that the courts come closer than they do today to the actual facts, and exercise more care in the art of fact-finding. The several privileges and the out-of-date exclusionary rules of evidence (including notably the rule against hearsay) doubtless need reconsideration by our legislatures. But they are the least of the impediments to adequate fact-finding—which, while it is the most difficult and perhaps the most important part of the judicial process, receives the least study. As long as we continue to employ the jury's general verdict, instead of using special verdicts, it is pretty much a waste of time to bother about the niceties of the evidence which juries are permitted and not permitted to hear. *For there is much reason to believe that juries frequently bring in inscrutable general verdicts which have little relation to the evidence and little or nothing to do with any purported findings of fact made by them.*[36] *And, if that is true, then the abolition of the hearsay rule and of all the*

---

son & Co., 264 U.S. 219, 236, 44 S.Ct. 302, 68 L.Ed. 646; cf. Louisville Gas Co. v. Coleman, 277 U.S. 32, 41, 48 S.Ct. 423, 72 L.Ed. 770.

[33] Cf. Douglas v. City of Jeannette, 3 Cir., 130 F.2d 652, 657, 658.

[34] Cf. Corwin, loc. cit.; Thompson v. Utah, 170 U.S. 343, 18 S.Ct. 620, 42 L. Ed. 1061; Ex parte Wilson, 114 U.S. 417, 422, 5 S.Ct. 935, 29 L.Ed. 89; United States v. Wong Kim Ark, 169 U.S. 649, 654, 18 S.Ct. 456, 42 L.Ed. 890.

[35] Cf. Blair, Bench, Bar and Social Change, an address before the New York State Bar Association (1942).

[36] For an excellent exposition of the vices of the general verdict, see Sunderland, Verdicts, General and Special, 29 Yale L.J. 253 (1919). Cf. Foster v. Moore-McCormack Lines, 2 Cir., Dec. 7, 1942, 131 F.2d 907. See Osborn, The Mind of the Juror (Student's Edition, 1937), 60, 163, 164, 165, 167.

Think of what would be the outcry

*privileges, coupled with the greatest improvements in pre-trial discovery, will often merely mean that juries will hear more evidence which they will disregard.*[37] Courtroom fact-finding, since it is a human undertaking, can never be perfect, but it can and should be improved *as far as possible.*[38] And the greatest single obstacle to that improvement is the devotion of much of our legal profession to the thesis that a lawsuit is essentially a sporting event,[39] a thesis which, when limited to an espousal of the preservation of an appropriately supplemented contentious procedure,[40] is intelligent, but, which, when carried to excess, as it often is,[41] flies in the face of common sense and would shock all of us lawyers and judges if custom had not made us callous to the injustices it all too frequently produces.[42]

---

if administrative agencies, usually composed of trained fact-finders, brought in general verdicts instead of making specific findings of fact.

[37] Morgan has brilliantly described the unfortunate consequences of the fact that today a trial is not "a proceeding for the discovery of the truth by rational processes" but "a game in which the contestants are not the litigants but the lawyers." Book Review, 49 Harv.L.Rev. (1936) 1387, 1389.

See Goldstein, Trial Techniques (1936) where the tricks of the jury lawyers' trade, developed to frustrate justice, are dispassionately described.

Thayer, A Preliminary Treatise on Evidence (1898) 535 remarked on the way in which jury trials may lead to "the demoralization of the bar." See Osborn, loc. cit., 97, 190, 191.

[38] Cf. United States v. Forness, 2 Cir., 125 F.2d 928, 942, 943.

[39] Cf. Wigmore, Evidence (3d ed.) § 1845; Seagle, The Quest For Law (1941), 844ff; In re Barnett, 2 Cir., 124 F.2d 1005; Osborn, loc. cit., 12, 83, 86.

[40] The adversary or contentious method of trials is doubtless of great value in bringing to the attention of the court aspects of a case, either "factual" or "legal," which might otherwise be overlooked, although there is reason to doubt whether it is invariably true that, to quote Macaulay, "a tribunal will decide a judicial question most fairly when it has heard two able men argue, as unfairly as possible, on the two sides of it * * *" Macaulay goes on to say: "Sometimes, it is true, superior eloquence and dexterity will make the worse appear the better reason; but it is at least certain that the judge will be compelled to contemplate the case under two different aspects." Essay on History (1828). There may, however, be more than two aspects of a case; cf. Aero Spark Plug, Inc., v. B. G. Corp., 2 Cir., 130 F.2d 290, 299 and note 30; In re Barnett, supra, 124 F.2d at page 1011.

Since a court's judgment or decree at the end of a trial is a governmental act (enforced by the government through its sheriffs, policemen and even the army, if necessary), the court—an agency of government created to administer justice by applying rules of law to the facts of cases and supposed to be devoted to the democratic principle of "equality before the law"—should have some considerable responsibility for seeing to it that injustice is not done, and that cases actually alike are not decided differently because of the following obstacles: Lack of skill or diligence of the lawyer for one of the parties or lack of funds by one of the parties making it impossible for him to finance a sufficient investigation before trial, often means that crucial available evidence is not discovered.

*Pre-trial discovery under the new rules, although highly desirable, does not suffice: The efficacy of that device, at best, depends on the ability of the lawyers. And, often, a crucial piece of evidence is not known to the adversary but can be discovered only through extensive and expensive investigation. Consider, too, stockholders' suits where, often, the adequate uncovering of the facts requires thousands of dollars for accounting alone.*

Accordingly, there should be considered the suggestion that all trial courts should be so staffed as to employ, to some extent, the methods of the domestic relations and juvenile courts. If something like that were done, court officials would make investigations before trial that would bring to light documentary evidence (and the like) which the lawyer for either side could put in evidence, or discover witnesses whom either lawyer could put on the stand. Such a device would not do away with but would supplement the contentious mode of procedure.

[41] Cf. L. Hand, The Deficiencies of Trials to Reach the Heart of the Matter, 3 Lectures on Legal Topics (1926) 89, 106.

[42] See Osborn, loc. cit., 75, 76, 167.

Wigmore (loc. cit., § 1845) has observed that the members of the legal profession who, in the past, have opposed reforms in trial procedures have done so because they feared loss of income. As we have elsewhere suggested, inertia, due to a variety of causes, may be a more

I am, then, not moved in this dissent by any sentimental desire to protect criminals or by a desire to prevent as full judicial scrutiny as is practicable of the facts of cases. I am moved by fear of the consequences to democratic government in general, and to the courts in particular, of judicial disregard of specific unrepealed sections of the Constitution. Courts, when they conduct themselves in that manner, invite popular rejection of our established legal institutions by unlawful means.

satisfactory explanation; Hoffman v. Palmer, 2 Cir., 129 F.2d 976, 996, 997.

If, however, the economic factor is important, lawyers would do well to note that the unfairness of trials has induced many businessmen to forsake court trials and to turn to out-of-court arbitrations from which lawyers are often excluded —with resultant loss of income.