In re DONALD SHELDON
& CO., INC., Debtor.

Don L. HORWITZ, Trustee for the
Liquidation of Donald Sheldon
& Co., Inc., Plaintiff,

v.

Donald SHELDON, Defendant.

Bankruptcy No. 85–6538(AJG).
Adv. No. 89–6256(AJG).

United States Bankruptcy Court,
S.D. New York.

Feb. 16, 1996.

Goldman & Hafetz (Lawrence S. Goldman, Anastasia G. Margaris, of counsel), New York City, for Donald Sheldon.

Kaye, Scholer, Fierman, Hays & Handler (Jay Strum, John W. Schryber, Ross D. Cooper, of counsel), New York City, for Trustee.

## Memorandum Decision on Waiver of Fifth Amendment Privilege

ARTHUR J. GONZALEZ, Bankruptcy Judge.

### INTRODUCTION

Donald Sheldon is the principal and founder of Donald Sheldon & Co., Inc. (the "Debtor"), a securities brokerage house, which filed for Securities Investor Protection Act ("SIPA") liquidation in 1985. *See Federal Insurance Co. v. Horwitz (In re Donald Sheldon & Co., Inc.),* 150 B.R. 314, 315 (S.D.N.Y.1993). In 1989 Don L. Horwitz, the District Court appointed Trustee (the "Trust-

ee"[1]) of the Debtor, sued Mr. Sheldon for losses totaling approximately $14 million that ensued from the Debtor's failure. *Id.* at 315–16. Following a jury trial before the Honorable Francis G. Conrad, Mr. Sheldon was found liable to the Debtor's estate for approximately $10 million, plus interest and costs (the "Judgment"). *Id.* Mr. Sheldon moved for a stay of the execution of the Trustee's Judgment without posting the necessary supersedeas bond. (*Horwitz v. Sheldon*, 93 Civ. 4209(RO), Endorsed Memorandum 9/28/93.) Judge Conrad denied the foregoing motion and the Honorable Richard Owen denied Mr. Sheldon's interlocutory appeal for a stay. (*Id.*) Thereafter, the Trustee scheduled a deposition[2] of Mr. Sheldon to ascertain the whereabouts of any assets Mr. Sheldon possessed to satisfy the Judgment. Mr. Sheldon failed to appear for the deposition.

## FACTS

### Contempt Proceedings

Judge Conrad issued a Contempt Order finding Mr. Sheldon in contempt of court for failing to provide testimony and documents regarding his assets which this Court ordered him to produce on March 15, 1993 and May 19, 1993. (Conrad Contempt Order, 7/29/93). The Contempt Order provided that Mr. Sheldon's contempt would not be purged until he had completed the deposition.

Further, the Contempt Order provided for the issuance of a Body Execution Warrant, which ordered the United States Marshal "to seize the person of Donald T. Sheldon." Mr. Sheldon did not appeal the Contempt Order.

On or about November 9, 1995, this Court entered an Amended Body Execution Warrant ordering the seizure of Mr. Sheldon "for his contempt of this Court's orders of March 15, 1993 and May 19, 1993, directing that he provide discovery of the location and amounts of his assets."

Pursuant to the amended warrant, the U.S. Marshals arrested Mr. Sheldon on Friday, November 10, 1995, and held him in confinement over the weekend.

### Chronology of Donald Sheldon's Deposition

On Monday, November 13, 1995, before the commencement of the deposition, the Court[3] advised Mr. Sheldon that the Court and the Trustee could wait until counsel arrived to represent him before commencing the deposition. (Tr. 11/13/95 at 3, 11:00 a.m.) Mr. Sheldon indicated he could not afford an attorney, stating, "I have no money to buy an attorney." (*Id.*) The Court informed Mr. Sheldon that if he could establish he were indigent, a court appointed attorney could be provided for bail purposes. (*Id.*) The Court also informed Mr. Sheldon that because he was there for an examination in a civil proceeding, the government was not obligated to provide him with counsel. (*Id.* at 3–4.) Mr. Sheldon stated in Court his willingness to cooperate and proceed with the deposition.

> The last request I made of an attorney was to contact [the Trustee] and negotiate a settlement. That was never done. I have no idea what [the Trustee] has in mind, but I don't really care. Whatever [he] has in mind, I am perfectly willing to do.

(*Id.* at 4.)

The Court directed the deposition to proceed and continue until its completion pursuant to orders issued by this Court and Judge Conrad. (*Id.* at 4.) The Court also advised the parties that it was available to resolve any discovery disputes. (*Id.* at 5.)

Thereafter, the Trustee sought the Court's intervention regarding a discovery issue concerning alleged evasive responses. (Tr. 11/13/95 at 3–4, 4:00 p.m.) After listening to a number of the questions posed and responses given during the deposition, without ruling whether Mr. Sheldon was evasive in the deposition, the Court admonished Mr.

---

**1.** Hereinafter, references to the Trustee denote either the Trustee or his counsel.

**2.** The deposition was noticed pursuant to Federal Rules of Bankruptcy Procedure 7030, 7034, 7069, 2004 and 15 U.S.C. § 78fff–1(d)(2).

**3.** This Court was unavailable for the morning and afternoon sessions of this proceeding conducted on November 13, 1995. Judge Gallet handled the matter during that period. This Court did, however, preside over the evening session on that date.

Sheldon and urged him to return to the deposition and that he was "required to give as much information, specific and detailed, as [he reasonably had]." (*Id.* at 3–6.) The Court informed Mr. Sheldon that he had the right to invoke the Fifth Amendment privilege. (*Id.* at 6.) However, if he chose to, he was required to indicate the basis for the privilege. (*Id.*) In addition, Mr. Sheldon admitted that he was hiding from the Trustee for the past two and a half years. (*Id.* at 9–11.) Further, Mr. Sheldon stated:

Your Honor, this case is ten years old. My wife, my friends, my family have been harassed. I have no money....

Your Honor, I have told you the first thing this morning, I am willing to do whatever these gentlemen want to settle this matter. I want it [referring to the case] out of my life now, I can't take any more of this.

(*Id.* at 5.) The Court ordered the examination to proceed forthwith.

That evening the Court's intervention was requested again. This Court began the proceeding by inquiring whether Mr. Sheldon was again declining the opportunity to retain counsel. (Tr. 11/13/95 at 3, 7:30 p.m.) This time, Mr. Sheldon indicated he was attempting to retain counsel. (*Id.*) This Court recommended that Mr. Sheldon continue his efforts in obtaining counsel. (*Id.* at 4.) This Court advised Mr. Sheldon that because he admitted that he had been a fugitive from this Court's order for the past two and one half years, the Court could not be assured of his return to complete the deposition and therefore ordered that Mr. Sheldon continue in the Marshal's custody. (*Id.* at 8.) This Court adjourned the deposition until the following morning. (*Id.*)

On November 14, 1995, Mr. Sheldon requested additional time to retain counsel. (Tr. 11/14/95 at 4, 10:40 a.m.) Again, this Court indicated that it supported Mr. Sheldon's decision to retain counsel but made clear that because Mr. Sheldon was a "flight" risk, he would have to stay in custody. (*Id.* at 4–8.) This Court adjourned the deposition to November 20, 1995 but advised Mr. Sheldon that if he were to retain counsel earlier and wished to advance the date for the deposition or set a hearing, the Court was readily

available to entertain that request. (*Id.* at 8.)

On November 20, 1995, Mr. Sheldon informed the Court that he needed additional time to retain counsel; that counsel had been contacted and would be provided a retainer on November 21, 1995; however, counsel would not commence representation until the retainer check had "cleared." (Tr. 11/20/95 at 9–11, 10:52 a.m.) The deposition was adjourned until November 27, 1995 and Mr. Sheldon's custody continued. (*Id.* at 11–12.) This Court informed the parties that it would be unavailable on November 27, 1995 and had arranged for Judge Gallet to handle the matter on the 27th. (*Id.* at 12.)

On November 27, 1995, Mrs. Sheldon, speaking on behalf of Mr. Sheldon and herself, advised the Court that the checks (referring to the retainer checks issued to the Sheldons' respective proposed counsel) had not yet cleared and requested another adjournment. (Tr. 11/27/95 at 7.) Judge Gallet rescheduled Mr. Sheldon's appearance for December 6, 1995 at 9:30 a.m. (*Id.*) The custody order was continued. (*Id.* at 9.)

On December 6, 1995, the deposition continued. (Tr. 12/6/95 at 23–24, 9:30 a.m.) Mr. Sheldon, now represented by counsel, invoked the Fifth Amendment approximately one hundred times and the spousal privilege ten times. Following the deposition, a hearing was held before this Court during which Mr. Sheldon's counsel argued that Mr. Sheldon had answered all the questions posed at the deposition either directly or by claiming a privilege. (*Id.* at 109–118.) Further, even if the Court found that the deposition were not complete, Mr. Sheldon should be released because there was no longer any threat that he may flee because "[Mr. Sheldon] is totally a different person today than he was at the last deposition[,]" and "He has learned what has happened. He certainly learned if he does not appear as required, probably a lot worse is going to happen to him." (*Id.* at 131, 134.) Mr. Sheldon's counsel moved the Court to release Mr. Sheldon with "conditions." (*Id.* at 132.) The Trustee argued that the deposition was not completed because Mr. Sheldon did not properly assert the Fifth Amendment and spousal privileges,

and further, the deposition should not be deemed as completed until the document production pursuant to the same subpoena was satisfied. (*Id.* at 108.) In addition, the Trustee argued that he did not believe that adequate assurances were presented by Mr. Sheldon's counsel that would ensure Mr. Sheldon's return for continued proceedings. (*Id.* at 135–136.) Mr. Sheldon's counsel disagreed with the position of the Trustee regarding the Fifth Amendment and spousal privileges and stated that Mr. Sheldon needed to be released in order to complete the document production.

This Court ruled that even if a basis were established for the assertion of the Fifth Amendment privilege regarding the questions posed, the Court still had to determine whether there had been a waiver of the Fifth Amendment and whether the spousal privilege was properly asserted. (*Id.* at 138.) Therefore, the deposition was not completed and the issue to be resolved was whether Mr. Sheldon should remain in custody to assure his continued appearance at the deposition. (*Id.* at 144–150.) Inasmuch as counsel had not provided adequate assurance of Mr. Sheldon's continued appearance, the Court ordered that Mr. Sheldon was to remain in custody. (*Id.*) Argument was set for the next day, December 7, 1995, with respect to the continued custody issues. (*Id.* at 150–151.) Also, an *in camera* hearing was scheduled for December 7th to afford counsel for Mr. Sheldon an opportunity to establish the basis for the assertion of Mr. Sheldon's Fifth Amendment privilege. (*Id.*)

Following the *in camera* hearing on December 7, 1995, the Court found that a *prima facie* case had been made with respect to many of the questions to which the Fifth Amendment privilege was asserted. (Tr. 12/7/95 at 5.) However, the issue of the waiver of the Fifth Amendment and whether

the spousal privilege was properly asserted still had to be decided by the Court. (*Id.* at 5–8.) Regarding the issue of Mr. Sheldon's release, his counsel stated that he was unable to put a "bail package" together. (*Id.* at 11–12.) Mr. Sheldon's counsel again moved for the release of Mr. Sheldon. (*Id.* at 18–19.) This Court directed counsel to "come up with some way to ensure that Mr. Sheldon will be here Monday, beyond what [Mr. Sheldon's counsel] proposed." (*Id.* at 43–44.) This Court suggested that counsel consider Title 18 and propose a creative way of assuring Mr. Sheldon's appearance on Monday, December 11, 1995, if he were released. (*Id.* at 44.) The hearing was adjourned to December 8, 1995. (*Id.* at 43.)

On December 8, 1995, counsel for Mr. Sheldon telephoned the Court's chambers to request an adjournment of the hearing set for that date. Counsel indicated that he had been informed the night before by the U.S. Attorney's Office for the Southern District of New York that a warrant had been issued by Southern District of New York Magistrate Judge James C. Francis IV for the arrest of Mr. Sheldon for violation of 18 U.S.C. § 401(3).[4] The warrant was issued for criminal contempt based on Mr. Sheldon's failure to comply with Judge Francis G. Conrad's March 15, 1993 Order. Counsel noted there was no reason to appear with respect to a bail package because even if Mr. Sheldon were released by order of the bankruptcy court, Mr. Sheldon would immediately be taken into custody based on the aforementioned warrant.

On December 11, 1995, this Court found that the issuance of the warrant by the Magistrate Judge provided it with assurance that Mr. Sheldon would attend future hearings regarding the deposition and, if necessary, its resumption. (Tr. 12/11/95 at 13–14.) Ac-

---

4. In a motion filed before this Court by Mrs. Sheldon to quash certain subpoenas, her counsel alleged, *inter alia*, that the Trustee was acting as a government agent in these matters. In support of that claim, counsel for Mrs. Sheldon alleged that the Trustee had "instigated" the criminal contempt proceedings against Mr. Sheldon now pending in the Southern District of New York. On January 24, 1996, at oral argument regarding the motion to quash, the Court advised the par-

ties that the Court had referred the matter of Mr. Sheldon's potential criminal contempt to the U.S. Attorney's Office to investigate and take whatever action it deemed appropriate. Further, the Court informed the parties that the Court had no reason to believe that the Trustee's involvement in the criminal contempt proceeding was anything more than responding to the U.S. Attorney's Office request for information in that matter.

cordingly, this Court directed the Marshals to process Mr. Sheldon's release. (*Id.* at 14–15.) The parties were directed to attend a hearing on December 18, 1995 for rulings on the spousal privilege and Fifth Amendment privilege. (*Id.* at 12, 14, 47.) The hearing was subsequently adjourned a number of times.

### Commencement of Donald Sheldon's Deposition

Mr. Sheldon's deposition was commenced on November 13, 1995, pursuant to Judge Conrad's Contempt Order. As previously indicated, Mr. Sheldon was not represented by counsel during the November 13, 1995 portion of the deposition. Before the commencement of Mr. Sheldon's deposition, Judge Gallet stated that the Court could wait for counsel to represent him and asked if he "wish[ed] to contact an attorney." (Tr. 11/13/95 at 3, 11:00 a.m.) Mr. Sheldon declined the Court's offer by stating "I have no money to buy an attorney" and decided to proceed with his deposition. (*Id.*) Judge Gallet also apprised Mr. Sheldon of his Fifth Amendment privilege against self incrimination. (Tr. 11/13/95 at 6, 4:00 p.m.)

At the commencement of the deposition, the Trustee asked Mr. Sheldon, where he lived; Mr. Sheldon responded "I live wherever I am, Jay [referring to Mr. Strum]." (Deposition Tr. 11/13/95 at 3, 11:10 a.m.) Mr. Sheldon was asked who paid for the motels that he had stayed in and his answer was that his wife paid for all the expenses. (*Id.* at 11, 17, 64–65, 93.) Mr. Sheldon was then asked how his wife paid for the motel bills and his response was "I have no idea." (*Id.* at 11.) Mr. Sheldon was asked whether his wife had any income or provided services to any one in 1995, 1994, and 1993 and what her source of income was. (*Id.* at 15–16.) Mr. Sheldon's responses to these questions were "I don't know" or "I don't recall." (*Id.*) Mr. Sheldon was asked the same questions whether he had any income in 1995, 1994, and 1993 and he responded in the same manner. (*Id.*) Mr. Sheldon was asked "What do you live on?" to which he responded "Air." (*Id.* at 16.)

Mr. Sheldon admitted to owning Bond Information Services, Inc. ["BIS"] (*Id.* at 19.) and Malvern Enterprises. (*Id.* at 32.) Mr. Sheldon was asked if he caused an invoice [dated January 10, 1995, in the amount of $3,600] "for services rendered" to be sent to Frank Henjes & Co., Inc. and whether Frank Henjes paid BIS or some other entity. (*Id.* at 20–21.) Mr. Sheldon was also asked if he rendered services to Frank Henjes & Co., Inc. that would have resulted in a bill being sent to Frank Henjes. (*Id.* at 22.) Mr. Sheldon answered these questions and subsequent questions related to the invoices and services rendered in a evasive manner such as "not to my recollection;" "I don't recall;" and "I don't know." (*Id.* at 21–22.)

Mr. Sheldon was first asked if he had ever heard of an entity known as Ocean Enterprises. (*Id.* at 23.) His answer was "I don't recall." (*Id.*) He was subsequently asked if he ever instructed Mr. Henjes to pay the invoices by wiring money into the account of Ocean Enterprises located at the Barnett Bank of Broward County Florida. (*Id.* at 24.) He answered "You know, I might have, but I don't recall for sure." (*Id.*) He was also asked that if he did not know anything about Ocean Enterprises, why he would have requested that money be wired to it. (*Id.*) His answer again was "I don't know." (*Id.*)

Mr. Sheldon was asked if in fact Ocean Enterprises was a sole proprietorship owned by his wife. (*Id.* at 25.) His answer was "I don't know" and subsequently he answered "No. It might be, but I just don't know for sure." (*Id.*) He was asked why he thought his wife owned Ocean Enterprises to which he also answered "I don't know." (*Id.*)

Exhibit 3 of Mr. Sheldon's deposition consisted of three-pages. The first was a copy of an envelope with the name Don written on it with some other writing, and the rest of it consisted of a copy of a letter that began with "Dear Don" and ended with "Love, Linda." [Mrs. Sheldon's first name is Linda.] (*Id.* at 37.)

Mr. Sheldon was asked if he had seen this before, and his response was "Jay, I don't know. I just don't recall seeing it, no. I might have. I don't know." (*Id.* at 37–38.) Mr. Sheldon was asked whether he recognized the handwriting and his response was

"Jay, I don't recognize handwriting, period." (*Id.* at 38.) Mr. Sheldon was then asked questions about the contents of the letter. Mr. Sheldon was asked if he knew the identity of the person referred to as Terri in the letter. (*Id.* at 39.) In response he stated "I guess, and I am only guessing, that is a reference to my daughter Theresa." (*Id.* at 40.) He was asked why his wife was asking whether Chubb [one of the insurance carriers of Mr. Sheldon's Officer and Director liability policy] knew anything about his assets to which he stated "I have no idea." (*Id.* at 40.) Mr. Sheldon was asked if he ever discussed with his wife what Chubb may have known about Bond Information Services or Malvern to which he responded "Jay, I may have, but I don't recall." (*Id.*) Mr. Sheldon was asked if Kaye Scholer [referring to Trustee's counsel] made a motion to dismiss any appeal of his to which he answered "I don't know. I just don't recall. I just have no idea." (*Id.*) The Trustee quoted the following statement from the letter: "And what do they know and what do we need to do to protect them [presumably referring to assets] if they know anything?" (*Id.* at 42.) Mr. Sheldon was asked if he ever discussed with his wife what they needed to do to protect his assets if Chubb knew anything about his assets to which he responded "Not that I recall." (*Id.* at 42–43.) The Trustee also read the following statement from the letter to Mr. Sheldon: "I'll overnight a copy of Kaye Scholer['s] motion to dismiss your appeal to Jim." (*Id.* at 41.) Mr. Sheldon was then asked if he ever discussed an appeal with Jim Frehter from Stroock & Stroock & Lavan to which he answered "Yes, sir, I did." (*Id.* at 42.) Mr. Sheldon was asked if he thought his wife wrote the letter to which he stated "I have no idea." (*Id.* at 43.)

After a recess was taken, Mr. Sheldon was asked if he paid any expenses; he answered "No." (*Id.* at 65.) He was then asked why and he responded that he did not have any money. (*Id.*) The next question was "But your wife does?" to which Mr. Sheldon just stated that she pays the bills. (*Id.*) The Trustee then inquired whether Mr. Sheldon's wife had money; and Mr. Sheldon's response was "I don't know. I assume she must have some money. She pays the bills." (*Id.* at 65–66.) He was asked if he had any individual or joint bank accounts; he answered "No." (*Id.* at 71–72.) He was also asked whether his wife had any individual or joint bank accounts; Mr. Sheldon responded in the negative and added "Only what you [Mr. Strum] have told me today, something about Barnett Bank." (*Id.* at 72–73.) He was asked if he had closed any bank accounts since August of 1993 to which he responded "Not that I recall." (*Id.* at 73.) He was subsequently asked if he knew of any accounts that his wife has closed since August of 1993, to which he stated "I have no idea." (*Id.*) He was again asked if he closed any accounts since July of 1992 and he answered "I don't know" or "not that I recall." (*Id.*)

Mr. Sheldon was asked if he ever discussed his wife's financial affairs with her to which he stated "Not really, no, sir." (*Id.* at 76.) He was asked how his wife managed to cover their expenses to which he answered "I really don't discuss financial matters with my wife." (*Id.* at 93.) He was asked whether he knew if his wife provided services recently and his answer was "I'm afraid, Jay, you would have to discuss that with her. She doesn't discuss her professional business with me." (*Id.* at 97.)

Mr. Sheldon was again asked about Ocean Enterprises' business. (*Id.* at 69.) This time, his answer was "It's my wife's company. You will have to ask her. I don't know." (*Id.*) Mr. Sheldon was asked if Ocean Enterprises had any bank accounts to which he answered "I don't know. You [referring to Mr. Strum] indicated there was a bank account in Ocean Enterprises' name in Barnett Bank, but that's my only knowledge of that." (*Id.* at 74.)

Mr. Sheldon made the following responses to many questions posed by the Trustee: "You [referring to the Trustee] have two parts to the question. You have asked a compound question, so I will give a compound answer." (*Id.* at 49.) "I answered the question. (*Id.* at 24, 31, 33, 38, 39.) I have put it in the record. That's all that I will say." (*Id.* at 24–25.) and stating the question had been "asked and answered." (*Id.* at 31, 55, 66, 67, 68, 69, 83, 88, 93, 94, 98, 99, 105,

108, 110, 111.) Toward the end of the deposition on November 13, 1995, Mr. Sheldon asked the Trustee if he had anything to refresh his memory to which the Trustee stated "Trying to figure out your answer, huh? No, I can't help you." (*Id.* at 106.) In response Mr. Sheldon answered "Sorry about that." (*Id.*)

### Frank Henjes' Deposition

On November 15, 1995, the Trustee conducted a deposition of Frank Henjes. Mr. Henjes provided the Trustee with the following information.

Mr. Sheldon and Frank Henjes have known each other for approximately twenty-five years, both professionally and personally. (Deposition Tr. 11/15/95 at 19.) They were both in the municipal bond business and shared information regarding securities transactions. (*Id.*) Mr. Sheldon owned Donald Sheldon & Co., Inc. and Mr. Henjes owned Frank Henjes & Co., Inc. (*Id.* at 19–20.) Mr. Henjes' expertise was in selling municipal bonds, particularly Puerto Rico's bond issues, to large institutions. (*Id.* at 18–20.) Mr. Sheldon's company was in the retail market, selling municipal bonds to individuals. (*Id.* at 19.)

Mr. Henjes was aware that Donald Sheldon & Co., Inc. went out of business in 1985 and Mr. Sheldon was hired by Mr. Henjes as a consultant. (*Id.* at 22.) Mr. Sheldon provided services to Frank Henjes & Co., Inc. and received compensation for these services. (*Id.*) Mr. Sheldon worked for Mr. Henjes sometime between 1985 and 1987 for six months and received approximately $8,000.00 a month. (*Id.* at 22–24.) Mr. Henjes' company went out of business sometime in 1987. (*Id.* at 25.)

Mr. Henjes started working for Laidlaw Holdings sometime in 1990 and worked there until January of 1993. (*Id.* at 28–29.) While Mr. Henjes was employed by Laidlaw Holdings, Mr. Sheldon provided consulting services to Mr. Henjes as an employee of Laidlaw Holdings. (*Id.* at 29–33.) Mr. Sheldon was compensated for services rendered to Mr. Henjes from 1990 to 1993. (*Id.* at 32–35.)

Sometime in 1991, it appears that Mr. Sheldon was working for Castle Securities. (*Id.* at 39–42, 50–51.) From January 1993 to the present, Mr. Henjes has been working at Sound Pension Management as a partner. During that period, Mr. Sheldon again provided Mr. Henjes with investment advice for which Mr. Sheldon was compensated. (*Id.* at 36.) Mr. Sheldon was paid approximately $1,000.00 per hour for investment services, which were provided directly to Mr. Henjes. (*Id.* at 52.) Mr. Sheldon was compensated only for investment advice provided by him personally to Mr. Henjes. (*Id.* at 54.) Mr. Henjes was directed by Mr. Sheldon to pay such compensation to either Bond Information Services or Ocean Enterprises. (*Id.*)

Mr. Henjes produced several invoices and wire transfer confirmations showing payments to either Bond Information Services or Ocean Enterprises. (*Id.* at 7–18.) These invoices from Bond Information Services for "consulting services" or "for services rendered" and wire transfer confirmations inscribed with "paid by wire" were dated from periods of 1993 to 1995. (*Id.*) Exhibit 11 of the Henjes Deposition was a four-page document which contained (i) a debit memo of Union Trust Company dated June 1, 1994, with the words "wire transfer to Barnett Bank, Florida, Ocean Enterprises" on the face; (ii) an invoice from Bond Information Services, Inc., to Frank Henjes & Company, Inc., dated May, 1994, for consulting in the amount of $3,600; (iii) a funds transfer request to be made to Ocean Enterprises; and (iv) a "check credit" dated June 1, 1994. (*Id.* at 14–15.) Exhibit 7 was a three-page document which contained (i) an invoice from Bond Information Services, Inc., to Frank Henjes & Company, Inc., dated January 10, 1995, for consulting in the amount of $3,600; (ii) a wire transfer confirmation dated February 16, 1995; and (iii) a wire transfer request dated February 16, 1995 from Frank Henjes & Company in the amount of $3,600 to Ocean Enterprises. (*Id.* at 20–21.)

### Continuation of Donald Sheldon's Deposition

Mr. Sheldon's deposition was continued on December 6, 1995. The delay between depositions was caused by Mr. Sheldon's request-

ed adjournments to permit him time to retain counsel. On December 6, 1995, Mr. Sheldon was represented by counsel. At this deposition Mr. Sheldon was asked questions concerning similar, and additional, subject matter to that which was asked on November 13, 1995. As previously noted, Mr. Sheldon responded to many of the questions asked by the Trustee at the continued deposition by asserting the Fifth Amendment or spousal privilege.

The Trustee argues that, by responding to questions as to which Mr. Sheldon could have asserted, but did not assert, his Fifth Amendment privilege, Mr. Sheldon has waived that privilege with respect to that question and all questions on the same subject matter.

## DISCUSSION

### Fifth Amendment Privilege

During the December 6, 1995 continued deposition, Mr. Sheldon raised his Fifth Amendment privilege against compulsory self incrimination, and spousal privilege as to alleged confidential communications with his wife. U.S. Const.Amend. V.; NYCPLR § 4502(b). This decision addresses Mr. Sheldon's Fifth Amendment privilege claims.[5]

Privileges are governed by Rule 501 of the Federal Rules of Evidence which provides:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of common law as they may be interpreted by the courts of the United States in light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political sub-

division thereof shall be determined in accordance with State Law.

The Fifth Amendment declares in part: "No person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const.Amend. V. This protection against self-incrimination may be invoked whether the answer would itself support a criminal conviction or the answer would furnish a link in the chain of evidence required to prosecute. *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); *Klein v. Smith,* 559 F.2d 189, 200 (2d Cir.), *cert. denied,* 434 U.S. 987, 98 S.Ct. 617, 54 L.Ed.2d 482 (1977). If the disclosure would tend to incriminate the witness, regardless of whether or not it is an element of the crime, disclosure will not be compelled. *United States v. St. Pierre,* 132 F.2d 837, 838 (2d Cir.1942). The protection is available if the declarant has reasonable cause to fear the consequences of an answer. The court determines whether the apprehension is reasonable, basing its decision on the facts of the case from the implications of the questions and from the setting of the case. *Hoffman,* 341 U.S. at 486, 71 S.Ct. at 818.

The privilege against self-incrimination epitomizes the foundation of our justice system which endorses an adversarial rather than an inquisitorial system. *United States v. Yurasovich,* 580 F.2d 1212, 1215 (3d Cir.1978). The axiom adopted is that "it were better for an occasional crime to go unpunished than that the prosecution should be free to build up a criminal case, in whole or in part, with the assistance of enforced disclosures by the accused." *Id.* (footnote omitted) (quoting *Maffie v. United States,* 209 F.2d 225, 227 (1st Cir.1954)). Justice Powell commented in *Kastigar v. United States,* 406 U.S. 441, 445, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972), that the axiom against self-incrimination "reflects a complex of our fundamental values and aspirations, and marks an important advance in the development of our liberty.... This Court has been

---

**5.** See Decision on Invocation of Spousal Privilege, dated January 2, 1996, wherein this Court held that Mr. Sheldon was precluded from invoking the spousal privilege as to communications regarding the concealment of assets from the Trustee, a judgment creditor, even if the communications were intended to be confidential.

zealous to safeguard the values that underlie the privilege." *Id.*

■ The privilege may be asserted in a civil proceeding. *E.F. Hutton & Co. Inc. v. Jupiter Development Corp.*, 91 F.R.D. 110, 114 (S.D.N.Y.1981) (citing *Kastigar*, 406 U.S. at 444, 92 S.Ct. at 1656). The witness may refuse to answer a question in a civil proceeding, if the answers might incriminate that witness in a future criminal proceeding. *In re Hulon*, 92 B.R. 670, 673 (Bankr. N.D.Tex.1988) (applying the privilege in the context of a bankruptcy proceeding).

This Court reviewed the deposition transcript of December 6, 1995 and the briefs filed by the parties with respect to the Fifth Amendment privilege claims, and also considered the *in camera* hearing wherein Mr. Sheldon's counsel detailed the basis for the assertion of the Fifth Amendment, and determined that Mr. Sheldon had made a *prima facie* showing that the answers to the questions posed could possibly lead to prosecution. At a January 24, 1996 hearing, the court, citing *Klein v. Smith*, 559 F.2d at 200, ruled that "there was reasonable cause for Mr. Sheldon to believe that a direct answer would support a conviction or furnish a link in a chain of evidence to support a conviction." While making this finding, the Court reserved decision on whether Mr. Sheldon could avail himself of the privilege until it rendered its decision on the issue of waiver of the privilege.

### Waiver of Fifth Amendment Privilege

■ Waiver of the Fifth Amendment privilege may be inferred from a witness' course of conduct or prior statements concerning the subject matter of the case, without inquiring into whether or not the witness was aware of the privilege and chose to waive it consciously. *Klein v. Harris*, 667 F.2d 274, 287 (2d Cir.1981); *see E.F. Hutton*, 91 F.R.D. at 114. The privilege against self-incrimination is waived if it is not invoked. *Rogers v. United States*, 340 U.S. 367, 371, 71 S.Ct. 438, 440, 95 L.Ed. 344 (1951) (citing *United States v. Murdock*, 284 U.S. 141, 148, 52 S.Ct. 63, 64, 76 L.Ed. 210 (1931)). The court in *United States v. O'Henry's Film Works, Inc.*, 598 F.2d 313, 317 (2d Cir.1979), stated that "[a] witness who fails to invoke the Fifth Amendment against questions as to which he could have claimed it is deemed to have waived his privilege respecting all questions on the same subject matter." If a witness elects to disclose incriminating facts, that witness waives the privilege respecting details of those facts. *Rogers*, 340 U.S. at 373, 71 S.Ct. at 442. Thus, the witness may not avoid disclosure of those details. *Id.* However, testimonial waiver is not lightly inferred. *Klein*, 667 F.2d at 287. Rather, courts accept all reasonable presumptions against finding a waiver. *Id.*

■ In *Klein*, this Circuit adopted a two-pronged inquiry in determining whether there has been a waiver of the Fifth Amendment privilege against self-incrimination. According to *Klein*, waiver is found if:

1) the witness' prior statements have created a significant likelihood that the finder of fact will be left with and prone to rely on a distorted view of the truth; and

2) the witness had reason to know that his prior statements would be interpreted as a waiver of the fifth amendment's privilege against self-incrimination.

*Klein*, 667 F.2d at 287.

■ The first prong in deciding whether there is a waiver of the Fifth Amendment privilege against self-incrimination, is derived from the court's decision in *St. Pierre*, 132 F.2d at 840, where Judge Learned Hand stated:

It must be conceded that the privilege is to suppress the truth, but that does not mean that it is a privilege to garble it; although its exercise deprives the parties of evidence, it should not furnish one side with what may be false evidence and deprive the other of any means of detecting the imposition. The time for the witness to protect himself is when the decision is first presented to him; he needs nothing more, and anything more puts a mischievous instrument at his disposal.

*Klein*, 667 F.2d at 287–88; *see also E.F. Hutton*, 91 F.R.D. at 116. This first requirement focusing on whether there is distortion of the truth, recognizes that the privilege allows the witness to suppress the truth, but

he may not "garble" it. *St. Pierre,* 132 F.2d at 840. Once a witness testifies about an issue, the witness may not relate only part of the story and decide to stop. Rather, the witness must fully disclose what he started to recount and be amenable to cross-examination on the topic. *Id.* After the witness testifies, that witness may not claim the privilege because it would lead to distortion of the facts. *Rogers,* 340 U.S. at 371, 71 S.Ct. at 441. The court's concern is whether the prior statements have "created a significant danger of distortion," because waiver of the privilege should only be recognized in the "most compelling of circumstances." *Klein,* 667 F.2d at 288. These circumstances require a showing that failure to find waiver would prejudice a party to the litigation. *Id.* Thus, there are compelling circumstances if refusal to find a "waiver would unduly prejudice the trustee." *Hulon,* 92 B.R. at 674. A party is prejudiced if the finder of fact is left with misleading information and likely to rely on that information. *E.F. Hutton,* 91 F.R.D. at 116.

The second prong, concerning the witness' knowledge that the prior statement would be interpreted as a waiver, is found if the prior statements were both 1) testimonial, that is, voluntarily made under oath in the same proceeding, and 2) incriminating. *Klein,* 667 F.2d at 288. The *Klein* court held that a witness who makes testimonial statements that are incriminating must know that these statements will be perceived as a waiver of the privilege against self-incrimination because the witness is both aware that statements made under oath are likely to influence the finder of fact, and cognizant of the fact that he can refuse to reveal incriminating facts. *Id.* Thus, the *Klein* court found that it was not unfair to the witness to find a waiver. *Id.* If the statement is both incriminating and testimonial, it can be considered to "have been made under circumstances such that the witness should have known that he or she might, by virtue of having made the statement, be found to have waived the privilege against self-incrimination." *E.F. Hutton,* 91 F.R.D. at 114–15.

We now address the first prong of the *Klein* test, that is, whether Mr. Sheldon's statements have created a significant likelihood that the "finder of fact" will be left with and prone to rely on a distorted view of the truth.

The overriding concern is whether there are compelling circumstances to find a waiver. These circumstances are present "only when a failure to find a waiver would prejudice a party to the action, and a finding of a waiver would not be unfair to the witness." *E.F. Hutton,* 91 F.R.D. at 116. As previously noted, to determine if there are compelling circumstances, the focus is on whether the "prior testimony has created a significant danger of distortion." *Klein,* 667 F.2d at 288. The witness may not be allowed to testify only to the extent that the information provided would support his version of the story and then preclude his adversary from eliciting further details, thereby depriving that party of evidence and leaving a misleadingly incomplete picture. Thus, if allowing any prior statements to stand without clarification leaves a distorted view of the facts on which the finder of fact might rely and if this reliance prejudices a party, the court should find that the witness has waived the privilege.

Where the finder of fact is not prone to rely on a distorted version of the truth based on the earlier testimony, there is no waiver. *E.F. Hutton,* 91 F.R.D. at 117. In *E.F. Hutton,* it was argued that statements made in an affidavit submitted by a party in support of its motion to file a third-party complaint waived the affiant's Fifth Amendment privilege. The court found that because it had denied the motion to file the third-party complaint as untimely filed, the court had not relied on the affidavit. Thus, the court reasoned that even if a distorted view of the facts was set forth in the affidavit, no party was prejudiced by the distortion absent reliance by the finder of fact. *Id.*

In *Maguire & Co., Inc. v. Margolies (In re Candor Diamond Corp.),* 42 B.R. 916, 919–20 (Bankr.S.D.N.Y.1984), the court found that the relevant prior affidavit and testimony would, under ordinary circumstances, have waived the right of the witness to claim the

Fifth Amendment privilege. However, because a default judgment had been entered, the court found that even if the prior statements did distort the facts, there was no prejudice to any party because the court did not rely on the affidavit or testimony. When the default judgment was subsequently vacated and the matter was again before the bankruptcy court, the court then found that the new circumstances posed a significant danger that the court would rely on this unchallenged affidavit and testimony and therefore found the privilege against self-incrimination was waived because of the significant likelihood of distortion.

■ The finder of fact is usually the court or a jury. However, the Trustee argues that, because the deposition is being conducted pursuant to Fed.R.Civ.P. 69, incorporated into bankruptcy procedure by Fed.R.Bankr.P. 7069, as a proceeding supplementary to and in aid of judgment, the Trustee is the finder of fact. The Trustee maintains that the fact finding associated with the trial was concluded when the jury rendered the verdicts and the court entered the judgment. The Court's current role, according to the Trustee, is to facilitate the execution of the judgment. Further, the only purpose of the proceeding conducted pursuant to Fed.R.Civ.P. 69 is to locate assets. The Trustee states that he is charged with the duty of finding the facts that would lead him to the identity and location of Mr. Sheldon's assets and that the discovery permitted, under Fed.R.Civ.P. 69, is to accomplish that objective.

Mr. Sheldon's counsel argues that there is no finder of fact because there is no case or controversy. Rather, he asserts, this is an investigation by the Trustee of Mr. Sheldon's assets for the purpose of gathering those assets and distributing them to creditors. Further, he maintains that the fact that the Trustee is trying "to find" assets does not make the Trustee the finder of fact.

■ For the narrow purposes of the deposition, which is a proceeding to ascertain the location of Mr. Sheldon's assets, this Court holds that the Trustee is the finder of fact. The proceeding is not an ordinary investigation. Rather, it is a deposition conducted under oath pursuant to a federal rule. This Court finds it untenable that in a proceeding conducted under oath there could be no circumstances under which the privilege would be waived.

The "finder of fact" or "trier of fact," as those terms are used in the applicable case law is the person who determines the facts to be used to reach a conclusion. The argument that because the Trustee is the finder of assets does not make him the finder of fact looks only at the use of the word finder in the sense of "gatherer." In addition to meaning a gatherer, however, finder also denotes one who makes a determination. In the proceeding in aid of execution, both meanings of "finder" apply to the Trustee. The Trustee is attempting to "gather" information to make a "determination" as to what testimony and evidence provided he is to believe and pursue. As the person who determines the facts to be utilized in the effort to locate assets, the Trustee is the "finder of fact."

Having concluded that the Trustee is the finder of fact, the court must determine whether the Trustee was left with and prone to rely on a distorted view of the truth. The Trustee concedes that he has not relied on Mr. Sheldon's testimony. The Trustee states that Mr. Sheldon "has told us nothing." The invocation of the privilege, after Mr. Sheldon's initial testimony, leaves the Trustee in the same position as prior to that testimony. Thus, given the content of that prior testimony, the Trustee is not now prejudiced by Mr. Sheldon's decision to avail himself of the privilege. *SEC v. Cayman Islands Reinsurance Corp., Ltd.*, 551 F.Supp. 1056, 1058 (S.D.N.Y.1982). While eliciting the information would be useful in the Trustee's efforts to locate assets, he has not been prejudiced because Mr. Sheldon's vague statements added nothing new. *Id.*

Even if the finder of fact is this Court, as it would certainly be if an issue arose concerning the ownership of assets, this Court would not be mislead by Mr. Sheldon's testimony, nor the Trustee prejudiced by same. There would be no reliance because Mr. Sheldon's statements generally provided no

meaningful information. To the extent that any information was provided, it could be corroborated by other evidence already in the possession of the Trustee. Therefore, there would be no distortion. *United States v. Singer,* 785 F.2d 228, 241 (8th Cir.), *cert. denied,* 479 U.S. 883, 107 S.Ct. 273, 93 L.Ed.2d 249 (1986).

Finally, the Trustee argues that there is a compelling circumstance to find waiver because the Trustee has a compelling need to get the information as to the location of assets. The Trustee asserts that the information sought is the essence of what he needs to know and that Mr. Sheldon is the most important witness in the effort to locate assets. Further, that effort will be hampered or thwarted if Mr. Sheldon does not testify. Thus, the Trustee claims he will be prejudiced because there will be increased delay and difficulty in locating assets.

 The necessity of getting the information sought, however, is not the standard to establish compelling circumstances. If this were the required showing, there would always be compelling circumstances because in all cases there is a need for the information sought to be elicited. Compelling circumstances only develop when statements are made that add an element that makes it even more difficult to discern the information sought or places a further obstacle in the ability to get at the truth. The "prejudice to the party" contemplated by the decisions that find waiver is that the finder of fact will be left with and prone to rely on a misleadingly incomplete representation of the facts to the detriment of a party. *See E.F. Hutton,* 91 F.R.D. at 116. Mr. Sheldon's statements did not add anything new upon which the finder of fact would rely, regardless of who is the finder of fact. The proceeding is in the same posture as if Mr. Sheldon had initially invoked the Fifth Amendment privilege. Cognizant of our duty not to lightly infer a waiver but rather only find waiver in the most compelling circumstances, this Court finds that such circumstances are not present in this case.

Inasmuch as the *Klein* test is a conjunctive test, and we find that the first prong of the *Klein* test is not satisfied because the finder of fact would not be prone to rely on Mr. Sheldon's prior statements, we do not address the second prong.

## CONCLUSION

This Court concludes that because the finder of fact would not be prone to rely on Mr. Sheldon's prior statements, Mr. Sheldon did not waive his Fifth Amendment privilege against self-incrimination.

Counsel for Mr. Sheldon is to settle an order consistent with this decision by February 23, 1996, with a presentment date and time of February 27, 1996 at 10:00 a.m.